UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

WILLIAM ENGEL,

                    Plaintiff,

           - against -

THIRD AVENUE MANAGEMENT COMPANY
LLC, MARTIN J. WHITMAN, DAVID M. BARSE,
VINCENT J. DUGAN, W. JAMES HALL, JOSEPH
J. REARDON, and MICHAEL BUONO,

                    Defendants,

THIRD AVENUE TRUST, a Delaware Business
Trust,

                 Nominal Defendant.

———————————————————— x

No. _____

Notice of Removal

## NOTICE OF REMOVAL

      And now come Defendants Third Avenue Management LLC, a Delaware Limited
Liability Company, Vincent J. Dugan, W. James Hall, Joseph J. Reardon, Michael Buono, and
Third Avenue Trust (Nominal Defendant), a Delaware Business Trust, by and through their
attorneys Kramer Levin Naftalis & Frankel LLP, and file the within Notice of Removal and in
support thereof aver as follows:

     1.      On January 15, 2016, Plaintiff William Engel ("Engel") initiated an action by
            Summons and Complaint in the Supreme Court of the State of New York, County
            of New York, Index No. 650196/2016, against defendants Third Avenue
            Management LLC, Martin J. Whitman, David M. Barse, Vincent J. Dugan, W.

James Hall, Joseph J. Reardon, Michael Buono, and Third Avenue Trust.  A copy of the Complaint is attached hereto as Exhibit A.

2.  Engel has alleged a claim for breach of fiduciary duty against all defendants, and a claim for breach of contract against defendant Third Avenue Management LLC.

3.  Upon information and belief, and as alleged by Engel, Engel is a resident of Putney, Vermont.  Complaint at ¶ 20.

4.  Defendant Third Avenue Management LLC, whose principal place of business is located at 622 Third Avenue, New York, New York 10017, is a Delaware Limited Liability Company whose single member is Third Avenue Holdings Delaware LLC.

5.  The members of Third Avenue Holdings Delaware LLC are:

   a.  Michael Buono and Vincent J. Dugan, individuals and citizens of Staten Island, New York.

   b.  Ryan Dobratz, David Resnick, Michael Warlan, Barbara Whitman, James Whitman and Martin J. Whitman, individuals and citizens of New York, New York.

   c.  Harold Drachman, an individual and citizen of North Salem, New York.

   d.  Matthew Fine, an individual and citizen of Riverside, Connecticut.

   e.  W. James Hall, an individual and citizen of West Orange, New Jersey.

   f.  Thomas Lapointe, an individual and citizen of Greenwich, Connecticut.

   g.  Yang Lie, an individual and citizen of Rye Brook, New York.

   h.  Joanne Jaffin Mason, an individual and citizen of Weston, Connecticut.

   i.  Robert Rewey, an individual and citizen of Summit, New Jersey.

j.   Michael Sasso, an individual and citizen of Purchase, New York.

k.   Craig Urciuoli, an individual and citizen of Franklin Lakes, New Jersey.

l.   Thomas Whitman, an individual and citizen of Philadelphia, Pennsylvania.

m.  Michael Winer, an individual and citizen of Monterey, California.

n.   Jason Wolf, an individual and citizen of Rye, New York.

o.   El Train Acquisition LLC, a Delaware Limited Liability Company whose principal place of business is located in Prides Crossing, Massachusetts.

6.   With respect to those defendants not already named above:

a.   David M. Barse is an individual and citizen of Harrison, New York.

b.   Joseph J. Reardon is an individual and citizen of Westport, Connecticut.

7.   Third Avenue Trust functions as a nominal defendant in this action, and therefore its citizenship is not considered for purposes of determining diversity.

8.   Accordingly, there is complete diversity among the parties under 28 U.S.C. §1332(a).

9.   Engel seeks damages in excess of $75,000.00 in the above action, as alleged in the Complaint. Complaint ¶ 1.

10.  This Honorable Court has jurisdiction of this matter pursuant to 28 U.S.C. §1332(a) as the action is between citizens of different states and the amount in controversy is in excess of $75,000.00.

11.  The face of the Complaint reveals that plaintiff raises substantial questions of law under 15 U.S.C. § 80a-1 *et seq.*, and thus this Court also has jurisdiction on the basis of a federal question.

12.     Defendants were served with or otherwise received the Complaint on January 15,

2016 and have timely filed this Notice of Removal within thirty days of service.

13.     Defendants will provide written notice of this removal to counsel for Engel and

will file a copy of this notice with the Clerk of the Supreme Court of the State of

New York, County of New York.

WHEREFORE, defendants respectfully file this Notice of Removal.

Dated: New York, New York
   February 12, 2016

Respectfully submitted,

Kramer Levin Naftalis & Frankel LLP


By:    /s/ John P. Coffey
     John P. Coffey

1177 Avenue of the Americas
New York, New York 10036
(212) 715-9456

*Attorney for defendants Third Avenue
Management LLC, Vincent J. Dugan, W.
James Hall, Joseph J. Reardon, Michael
Buono & Third Avenue Trust (nominal
defendant)*

# EXHIBIT A

FILED: NEW YORK COUNTY CLERK 01/15/2016 11:32 AM
NYSCEF DOC. NO. 1

INDEX NO. 650196/2016
RECEIVED NYSCEF: 01/15/2016

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| WILLIAM ENGEL, | Index No. _____ |
|            Plaintiff, | |
| vs. | **SUMMONS** |
| THIRD AVENUE MANAGEMENT COMPANY LLC, MARTIN J. WHITMAN, DAVID M. BARSE, VINCENT J. DUGAN, W. JAMES HALL, JOSEPH J. REARDON, and MICHAEL BUONO, | |
|            Defendants, | |
| THIRD AVENUE TRUST, a Delaware Business Trust, | |
|            Nominal Defendant. | |

**TO THE ABOVE NAMED DEFENDANTS:**

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on plaintiff's attorneys within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Plaintiff designates New York County as the place of trial.   Venue is proper because the defendants do business in or derive substantial revenue from activities carried out in this County, and many of the wrongful acts alleged herein occurred in this County.

Dated: January 15, 2016

ZAMANSKY LLC


By: /s/ Samuel E. Bonderoff
       Samuel E. Bonderoff

Jacob H. Zamansky
Edward H. Glenn Jr.
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177
samuel@zamansky.com

Attorneys for the Plaintiff

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| WILLIAM ENGEL, | Index No. _____ |
| Plaintiff, | |
| vs. | DERIVATIVE COMPLAINT |
| | DEMAND FOR JURY TRIAL |
| THIRD AVENUE MANAGEMENT COMPANY LLC, MARTIN J. WHITMAN, DAVID M. BARSE, VINCENT J. DUGAN, W. JAMES HALL, JOSEPH J. REARDON, and MICHAEL BUONO, | |
| Defendants, | |
| THIRD AVENUE TRUST, a Delaware Business Trust, | |
| Nominal Defendant. | |

Plaintiff William Engel ("Engel"), by and through his undersigned counsel, alleges as follows on information and belief:

## NATURE OF THE CASE

1.     This is a shareholder derivative action brought by an investor in, and on behalf of, the Third Avenue Focused Credit Fund (the "Fund") to recover approximately $500 million of losses and other damages sustained as a direct result of Defendants' failure to comply with their most fundamental and basic duty—to manage and maintain sufficient liquidity for the Fund to stay open and in business.

2.     Section 22(e) of the Investment Company Act of 1940 (the "Act") provides that, absent "unusual circumstances," no open-end fund shall suspend the right of redemption for more than seven days.   Defendants, who are both the Fund's Board of Trustees and its

Investment Advisor, utterly failed to ensure that the Fund had sufficient liquidity to allow this right of redemption to be preserved, and thereby breached their most fundamental and basic fiduciary and contractual duties owed to the Fund.

3.      On December 9, 2015, Third Avenue Management LLC ("Third Avenue Management"), the Fund's Investment Advisor, issued a letter to investors notifying them that the Board had adopted a Plan of Liquidation for the Fund.  The letter stated that the Fund was no longer accepting redemptions or subscriptions and that its assets were being placed into a liquidating trust for sale over time.  The reason for such radical action, according to the letter, was that "[i]investor requests for redemption, in addition to the general reduction of liquidity in the fixed income markets, have made it impracticable for [the Fund] going forward to create sufficient cash to pay anticipated redemptions without resorting to sales at prices that would unfairly disadvantage remaining shareholders."   In other words, the Fund would close its doors and its assets would be sold off in a fire sale.

4.      This extreme action resulted from Third Avenue Management's and the Board's willful and/or grossly negligent breaches of fiduciary and contractual duties starting in June 2013 through the Fund's purported closure on December 9, 2015.  By failing to plan for and maintain the liquidity of the Fund to ensure that the right of redemption was not abridged, Defendants breached those legal duties in contravention of the Act and federal securities regulations as well as the Fund's registration statements and prospectuses.

5.      Throughout this time period, Defendants knew or should have known that the Fund and its sector faced increased demands by investors for redemption, and that there was increasing illiquidity in the fixed income markets in which the Fund's assets traded.  Defendants' failure to plan and prepare for the Fund's entirely foreseeable liquidity crisis killed the Fund.

Yet, while the Fund's assets deteriorated, Defendants insisted that the Fund was sufficiently liquid to forestall further redemptions. Defendants should compensate the Fund for the losses their breaches have caused the Fund and its investors.

6. In August 2009, the Fund was first offered to investors. It was offered as a separate investment "Series" or class of shares issued by Third Avenue Trust (the "Trust"), which is registered with the Securities and Exchange Commission ("SEC") as an open-end investment company under the Act. The Fund is managed by its Board, which hired Third Avenue Management as the Fund's Investment Advisor. The individual Defendants compose both the Board and Third Avenue Management's senior officers; thus, there is no independence between the Fund and its Investment Advisor.

7. The Fund's investment strategy has been to invest primarily in distressed and high-yield debt and credit-related investments. It was launched by Third Avenue Funds, which manages a family of mutual funds and private client accounts and has over $10 billion of customer funds under management. The Fund was the only mutual fund offered by Third Avenue that had a strategy of investing in non-publicly traded investments.

8. The Fund was an open-end investment company. Section 22(e) of the Act provides that no open-end fund shall suspend the right of redemption for more than seven days absent specific unusual circumstances that are not present here. The SEC's position has been that open-end funds should maintain a high degree of portfolio liquidity to ensure that their portfolio securities and other assets can be sold, and the proceeds used to satisfy redemptions, in a timely manner in order to comply with Section 22(e). The SEC has adopted a requirement limiting funds to only 15% of illiquid assets, and it has issued repeated guidance advising fund

3

managers that they must maintain liquidity to meet redemptions even if their investment strategy involves trading illiquid investments.

9.     In its registration statements, prospectus and statement of additional information, the Fund represented that it would meet investors' redemption requests without qualification, that it would limit illiquid securities to 15% of its assets, and that it would comply with the Act and SEC rules and regulations.   Accordingly, to comply with its regulatory requirements, the Fund had to adopt a plan to manage its liquidity— which, in turn, was supposed to have been actively monitored by the Board.

10.     Since June 2013, the fixed income markets have become increasingly volatile and illiquid.   Investors have also increasingly sought to redeem their money from fixed income funds.   In response, the SEC issued specific warning and guidance to fund managers on liquidity risk monitoring, managing and planning.   This warning and guidance put Defendants on specific notice that, without prophylactic action, the Fund was at risk for a liquidity crisis, and that Defendants needed to actively and prudently monitor and manage the Fund's liquidity to prevent such a crisis's occurrence.

11.     As the illiquidity in fixed income markets and increased investor redemptions grew, the Fund evidently ignored these warning signs and instead invested deeply in numerous assets that are not publicly traded and therefore present significant potential liquidity problems. For example, Fund has invested in large positions of distressed bonds, notes and bank loans, which, according to the Fund's financial statements, are Rule 144A securities that may only trade among qualified institutional buyers.   There is no liquid, public market for these securities.   The Fund also invested in positions of bank loans, which have delayed or longer settlement dates, so that they, too, cannot realize immediate redemptions.

4

12.     Defendants, who were responsible managing the Fund's liquidity so that it could make redemptions upon demand yet remain in business, willfully or grossly negligently breached their fiduciary and contractual duties to investors when they failed in this responsibility. Their failures resulted in the Fund's closure and forced liquidation. Following the SEC's warning, Defendants failed to sufficiently monitor, manage and plan for the Fund's liquidity in view of known increased illiquidity in the markets for the Fund's assets and the increased likelihood of investor redemptions.

13.     Defendants failed to sell, while those assets were salable, sufficient Fund assets to cover likely redemption demands before large declines in the prices of the Fund's assets made such sales virtually impossible. Defendants failed to "go to cash," which the Fund's prospectus represents it will do at times. Defendants also made additional purchases of Rule 144A debt securities at a time when they knew or should have known that the Fund should not be investing in more assets that were illiquid or ripe to become so.

14.     Defendants also represented to investors that the Fund held below 15% of "illiquid securities," a highly dubious representation given the rapid deterioration and closure of the Fund. In any event, whether the Fund was above or below its "illiquid securities" threshold—however Defendants self-servingly chose to define liquidity at the time—the Fund was clearly not sufficiently liquid to meet the redemption requests that had been building over the prior two years.

15.     As a result of Defendants' willful and grossly negligent breaches of fiduciary and contractual duties, the Fund has been substantially harmed. It has suffered at least $500 million in losses and will suffer additional losses as its assets are liquidated at fire-sale prices. The Fund paid substantial management fees to Third Avenue Management that were not deserved due to

5

Defendants' failures to comply with the Act, SEC rules and regulations, and provisions in the Fund's prospectus and registration statements.

16.     Through this action, Plaintiff seeks to recover on behalf of the Fund for these and other losses caused by the Defendants' willful and/or grossly negligent breaches of fiduciary and contractual duties.

17.     Demand has not been made and is excusable under applicable law because the Defendants, who are the trustees and managers of the Fund, were directly responsible for the misconduct alleged herein, and any demand that they sue themselves for their wrongful acts would be futile.

JURISDICTION AND VENUE

18.     The Court has jurisdiction over this action, pursuant to CPLR §302(a)(1), because Defendants are present and transact business in New York State, New York County.

19.     Venue is proper pursuant to CPLR §503(c) because Defendants have their principal office in New York County.

PARTIES

A.     PLAINTIFF

20.     Plaintiff William Engel is and has been a shareholder of the Fund since September 2009, and is a resident of Putney, Vermont.  He also currently holds his shares in the Fund, and has held continuously throughout the period of the alleged misconduct.

B.     NOMINAL DEFENDANT

21.     Nominal Defendant the Trust is a Delaware Business Trust with a principal office located at 622 Third Avenue, New York, New York.  The Trust has a Board of Trustees that manages its operations and is also responsible for the management of the Fund.

6

C.    DEFENDANTS

22.    Defendant Third Avenue Management is a limited liability company organized in New York, with a principal office located at 622 Third Avenue, New York, New York.  Third Avenue Management is a registered investment adviser with the SEC, and it is both the Trust's and Fund's Investment Advisor.

23.    Martin J. Whitman is the Chairman of the Board of the Trust, and a Founder and Co-Chief Investment Officer of Third Avenue Management.  His principal place of business is at 622 Third Avenue, New York, New York.

24.    David M. Barse is President and Chief Executive Officer of the Trust, and Chief Executive Officer of Third Avenue Management.  His principal place of business is at 622 Third Avenue, New York, New York.

25.    Vincent J. Dugan is Treasurer of the Trust, and Treasurer and Chief Financial Officers of Third Avenue Management.  His principal place of business is at 622 Third Avenue, New York, New York.

26.    W.  James Hall is General Counsel and Secretary and General Counsel and Secretary of Third Avenue Management.  His principal place of business is at 622 Third Avenue, New York, New York.

27.    Joseph J. Reardon is Chief Compliance Officer of the Trust and Chief Compliance Officer of Third Avenue Management.  His principal place of business is at 622 Third Avenue, New York, New York.

28.    Michael Buono is Controller of the Trust and Controller of Third Avenue Management.  His principal place of business is at 622 Third Avenue, New York, New York.

29.     Defendants Whitman, Barse, Dugan, Hall, Reardon and Buono are referred to collectively as the "individual Defendants."

## SUBSTANTIVE ALLEGATIONS

A.     <u>Background</u>

30.     In 1986, Third Avenue Funds was founded by Martin Whitman, an outspoken value investor, and it now manages a family of at least seven mutual funds and private client accounts and has over $10 billion of customer funds under management.

31.     In August 2009, the Fund was first offered to investors.  It was offered as a separate investment "Series" or class of shares established under Article 2.1 of the Trust Agreement of the Trust dated October 29, 1996.

32.     The Trust is registered with the SEC as an open-end investment company under the Act.  The Fund's shares were issued by the Trust and it is managed by its Board of Trustees, which is made up of the individual Defendants.

33.     The Board, in turn, hired Third Avenue Management as the Fund's Investment Advisor.   Third Avenue Management's senior officers are the individual Defendants.  Thus, the Board and Investment Advisor of the Fund here are the same people, meaning there is no independence between the Fund and its Investment Advisor.

34.     The Fund's investment strategy is to invest primarily in distressed and high-yield debt and credit-related investments.  Unlike the other funds offered by Third Avenue, the Fund had a strategy to invest in non-publicly traded investments.

35.     Since its launch in August 2009, the Fund's assets grew rapidly.  The Fund quickly raised over $700 million by the end of 2010, grew beyond $1 billion in 2013, and subsequently peaked at nearly $3 billion in assets.  As of October 31, 2015, the Fund had approximately $1 billion in assets (shortly before it closed).

36.     As a result of the Fund's growth, Third Avenue Management has received substantial fees based on the size of the Fund as of October 31:

| | |
|---|---|
| 2009: | $198,311 (after two months of operation) |
| 2010: | $5,281,680 |
| 2011: | $8,376,215 |
| 2012: | $7,609,834 |
| 2013: | $9,101,101 |
| 2014: | $21,083,384 |
| 2015: | $6,875,000  (estimated based on known assets) |

37.     In total, since its inception, Third Avenue Management has received approximately **$58 million** in fees for managing the Fund.

B.      <u>SEC Liquidity Requirements</u>

38.     The Fund was registered as an open-end investment company.  Section 22(e) of the Act provides that no open-end fund shall suspend the right of redemption or postpone the date of payment of redemption proceeds for more than seven days after tender of the security absent specified unusual circumstances.  In Release No. 33-9922, IC-31835, 17 CFR 210, 270, 274 (Sept. 22, 2015), the SEC issued a notice entitled *"Open-End Fund Liquidity Risk Management Programs; Swing Pricing; Re-Opening of Comment Period for Investment Company Reporting Modernization Release* (the "Proposed Rule),"  which set forth proposed rules for mutual fund liquidity.  In footnote 77, the SEC states that there may be liability for a mutual fund's failure to meet redemptions within seven days or any shorter period disclosed in the prospectus.

9

39.     Under current SEC guidelines, a portfolio security or other asset is considered illiquid if it cannot be sold or disposed of (rather than settled) in the ordinary course of business within seven days at approximately the value at which the fund has valued the investment.

40.     Additionally, Rule 15c6-1 under the Securities Exchange Act of 1934 impacts the timing of open-end fund redemptions because the rule requires broker-dealers to settle securities transactions, including transactions in open-end fund shares, within three business days after the trade date.   Furthermore, Rule 22c-1 under the Act, the "forward pricing" rule for mutual funds, requires funds, their principal underwriters, and dealers to sell and redeem fund shares at a price based on the current Net Asset Value ("NAV") next computed after receipt of an order to purchase or redeem fund shares, even though fund assets may be sold in subsequent days to meet redemption obligations.   Therefore, there are a number of statutory and regulatory provisions that must be considered in assessing a fund's ability to meet redemptions and mitigate potential dilution of shareholders' interests.

41.     Historically, the SEC has taken the position that open-end funds should maintain a high degree of portfolio liquidity to ensure that their portfolio securities and other assets can be sold and the proceeds used to satisfy redemptions in a timely manner to comply with section 22(e). The SEC also has stated that open-end funds have a "general responsibility to maintain a level of portfolio liquidity that is appropriate under the circumstances," and to engage in ongoing portfolio liquidity monitoring to determine whether an adequate level of portfolio liquidity is being maintained in light of the fund's redemption obligations. *See* Revisions of Guidelines to Form N-1A, Investment Company Act Release No. 18612 (Mar. 12, 1992) [57 FR 9828 (Mar. 20, 1992)] ("Guidelines Release").

42.     In addition to the importance of adequate liquidity, SEC guidelines generally limit an open-end fund's aggregate holdings of "illiquid securities" to 15% of a fund's net assets. Under the 15% guideline, a portfolio security or other asset is considered illiquid if it cannot be sold or disposed of in the ordinary course of business within seven days at approximately the value at which the fund has valued the investment. The 15% guideline has generally caused funds to limit their exposures to those types of securities that cannot be sold within seven days and that the SEC has indicated may be illiquid, such as private equity securities, securities purchased in an initial public offering, and certain other privately placed or other restricted securities as well as certain instruments or transactions not maturing within seven days.

43.     The SEC has not established a set of required factors that must be considered when assessing the liquidity of securities, but it has provided "examples of factors that would be reasonable for a board of directors to take into account with respect to a rule 144A security (but which would not necessarily be determinative)." These factors include: the frequency of trades and quotations for the security; the number of dealers willing to purchase or sell the security and the number of other potential purchasers; dealer undertakings to make a market in the security; and the nature of the security and the nature of the marketplace in which it trades, including the time needed to dispose of the security, the method of soliciting offers, and the mechanics of transfer. *See* Statement Regarding "*Restricted Securities*," Investment Company Act Release No. 5847 (Oct. 21, 1969) [35 FR 19989 (Dec. 31, 1970)] ("Restricted Securities Release").

44.     Under Rule 38a-1 of the Act, open-end funds are also required to adopt and implement written policies and procedures reasonably designed to prevent violations of the federal securities laws. A fund's compliance policies and procedures should be appropriately tailored to reflect each fund's particular compliance risks. The SEC has stated that an open-end

fund holding a significant portion of its assets in securities with long settlement periods or with infrequent trading, for instance, may be subject to relatively greater liquidity risks than other open-end funds, and should appropriately tailor its policies and procedures to comply with its redemption obligations.

45.     In the Restricted Securities Release, the SEC recognized that a fund may need to determine whether it is appropriate to take certain actions when it has determined that a previously liquid holding has become illiquid due to changed circumstances: "Because open-end companies hold themselves out at all times as being prepared to meet redemptions within seven days, it is essential that such companies maintain a portfolio of investments that enable them to fulfill that obligation. This requires a high degree of liquidity in the assets of open-end companies because the extent of redemption demands or other exigencies are not always predictable."

46.     The SEC has further stated that a fund experiencing net outflows due to shifts in market sentiment may wish to consider reducing its illiquid asset holdings to maintain adequate liquidity. *See* Guidelines Release.

47.     Moreover, in January 2014, the SEC issued specific guidance on policies that funds should use to management liquidity in IM Guidance Update 2014-1, *Risk Management in Changing Fixed Income Market Conditions* (Jan. 2014), *available at* http://www.sec.gov/divisions/investment/guidance/im-guidance-2014-1.pdf ("2014 Fixed Income Guidance Update"):

III. *Risk Management and Disclosure*

Given the potential fixed income market volatility, which may be exacerbated by changes in bond market size and structure discussed above, the Division of Investment Management staff notes the following steps that fund advisers may consider taking:

*Assess and Stress Test Liquidity*

Consistent with Section 22(e) of the Investment Company Act of 1940, fund advisers generally assess overall fund liquidity and funds' ability to meet potential redemptions over a number of periods. In light of potential market volatility, fund advisers may consider assessing fund liquidity needs during both normal and stressed environments, including assessing their sources of liquidity (such as cash holdings and other assets that would not require selling into declining or dislocated markets if volatility or market stress increases). The assessments may include, for example, needs and sources of fund liquidity over 1 day, 5 days, 30 days, and potentially longer periods.

*Conduct More General Stress-Tests/Scenario Analyses*

Fund advisers may consider assessing the impact (beyond just liquidity) of various stress-tests and/or other scenarios on funds. For example, they may consider stress-tests involving interest rate hikes, widening spreads, price shocks to fixed income products, increased volatility and reduced liquidity, among other factors.

*Risk Management Evaluation*

Fund advisers may want to consider using the outcomes of any assessments, analyses, and conversations to evaluate what risk management strategies and actions are most appropriate, if any, in response to changing fixed income market conditions at a fund and/or the complex level. These may include decisions around portfolio composition, concentrations, diversification and liquidity, among other factors.

*Communication with Fund Boards*

Fund advisers may consider what information should be provided to fund directors so that they are informed of the risk exposures and liquidity position of the fund, and the fund's ability to manage through changing interest rate conditions and potentially increased fixed income market volatility.

*Shareholder Communications*

Funds should also assess the adequacy of their disclosures to shareholders in light of any additional risks due to recent events in the fixed income markets and the potential impact of tapering quantitative easing and/or rising interest rates, including the potential for periods of volatility and increased redemptions. If a fund determines that its risk disclosure to shareholders is not sufficient in light of these recent events, the fund should consider the appropriate manner of communicating risks to shareholders (e.g., prospectus, shareholder reports).

At all times, Defendants, who controlled and managed all aspects of the Fund, had strict duties

and responsibilities to comply with these SEC rules and regulations requiring the Fund to

13

maintain its liquidity despite adverse or unexpected market conditions or investor redemption demands. Defendants also had strict duties and responsibilities to implement and monitor liquidity through a risk management program and to truthfully and accurately communicate liquidity risk to Fund investors.

C.   **The Fund's Representations**

48.   From the start, and until its sudden demise, the Fund has represented to investors that shares can be redeemed, that it will limit its investments in illiquid assets to 15%, that it would monitor liquidity, and that it holds liquid assets.

49.   For example, the Fund's prospectus filed on its Form NA-1 Registration Statement on August 24, 2009, provides for redemption without any qualification as follows:

HOW TO REDEEM SHARES

General

You may redeem your shares on any day during which the NYSE is open, either directly from the Fund or through certain broker-dealers or other financial intermediaries. Fund shares will be redeemed at the NAV next calculated as of a time after your order is received in good order by the Fund or its designees. Redemption requests that contain a restriction as to the time, date or share price at which the redemption is to be effective will not be honored. You can redeem less than all of your shares, but if you retain shares with a value below a minimum amount (as determined by the Adviser), your account may be closed at the discretion of the Adviser. See Redemption By The Fund.

50.   Additionally, in Statements of Additional Information filed by the Fund, the following provision is disclosed:

REDEMPTION OF SHARES

The procedure for redemption of Fund shares under ordinary circumstances is set forth in the Prospectus. In unusual circumstances, such as in the case of a suspension of the determination of NAV, the right of redemption is also suspended and shareholders will receive payment of the net asset value next determined after termination of the suspension. The right of redemption may be suspended or payment upon redemption deferred for more than seven days: (a) when trading on the New York Stock Exchange ("NYSE") is restricted; (b) when the NYSE is closed for other than weekends and

holidays; (c) when the SEC has by order permitted such suspension; or (d) when an emergency exists making disposal of portfolio securities or valuation of net assets of a Fund not reasonably practicable; provided that applicable rules and regulations of the SEC shall govern as to whether the conditions prescribed in (a), (c) or (d) exist.

51.     This provision identifies only very limited instances, which are determined by SEC rules and regulations, when the Fund will not honor redemptions..

52.     Following SEC rules and regulations, the Fund represented in its Statements of Additional Information that it would restrict its investment in illiquid securities to only 15% of Fund's assets.  The Fund also disclosed that the Board would monitor the liquidity of any non-public or Rule 144A securities in which it invests.

53.     The following provisions are in its Statements of Additional Information:

RESTRICTED AND ILLIQUID SECURITIES

Under normal circumstances, none of the Funds will purchase or otherwise acquire any investment if, as a result, more than 15% of its net assets (taken at current market value) would be invested in securities that are illiquid. Generally speaking, an illiquid security is any asset or investment of which a Fund cannot sell a normal trading unit in the ordinary course of business within seven days at approximately the value at which a Fund has valued the asset or investment, including securities that cannot be sold publicly due to legal or contractual restrictions. The sale of illiquid securities often requires more time and results in higher brokerage charges or dealer discounts and other selling expenses than does the sale of securities eligible for trading on national securities exchanges or in the over-the-counter markets. Restricted securities may sell at a price lower than similar securities that are not subject to restrictions on resale.

Over the past several years, strong institutional markets have developed for various types of restricted securities, including repurchase agreements, some types of commercial paper, and some corporate bonds and notes (commonly known as "Rule 144A Securities").   Securities freely salable among qualified institutional investors under special rules adopted by the SEC, or otherwise determined to be liquid, may be treated as liquid if they satisfy liquidity standards established by the Board of Trustees (the "Board").  The continued liquidity of such securities may not be as well assured as that of publicly traded securities, and accordingly, the Board will monitor their liquidity.  The Board will review pertinent factors such as trading activity, reliability of price information and trading patterns of comparable securities in determining whether to treat any such security as liquid for purposes of the foregoing 15% test.   To the extent the Board treats such securities as liquid, temporary impairments to trading patterns of such securities may adversely affect a Fund's liquidity.

54.     Generally, for most of its life, the Fund did not provide any specific disclosure about the liquidity or illiquidity of its investments. However, starting on January 6, 2015, the Fund began to disclosure its percentage of "illiquid assets" in the footnotes of its financial statements filed in its semi-annual and annual Certified Shareholder Reports. The Fund identified the following percentages:  i) Oct. 30, 2014 -- 14.25%; ii) Apr. 30, 2015 -- 12.22%; and iii) Oct. 31, 2015 -- 13.40%. These percentages, set by Defendants, purport to comply with SEC rules and regulations and the Fund's own restrictions on liquidity disclosures to investors.

55.     The Fund apparently began making these disclosures in response to the liquidity crisis that was affecting fixed income markets, seemingly in the hope of forestalling additional investor redemptions. These disclosures seemed intended to assure investors that the Fund had low percentages of illiquid assets and that the Board was diligently monitoring its assets for liquidity.

D.     **The Fund's Sudden Closure**

56.     On December 9, 2015, however, Fund investors were notified that the Board had closed for redemptions and adopted a Plan of Liquidation for the Fund.  Due to the prior disclosures, this letter was shocking and nearly unprecedented for an open-end company. The largest financial wire services and news agencies all reported on the Fund's failure, including the *Wall Street Journal*, because of how extraordinary it was.

57.     The Fund's sudden closure violated SEC requirements, including Section 22(e) of the Act, and disclosures in its registration statements and prospectuses. The limited few exceptions provided under SEC rules for "unusual circumstances" and the Fund's own policy for redemption stated in the Statement of Additional Information do not exist here. There was no

16

NYSE market closure or other sufficiently justifiable cause for the Fund to be forced to suspend redemptions—other than the Board's gross negligence and failure to manage its liquidity.

58.     The letter blamed the Fund's failure on "[i]nvestor requests for redemption, in addition to the general reduction of liquidity in the fixed income markets, have made it impracticable for [the Fund] going forward to create sufficient cash to pay anticipated redemptions without resorting to sales at prices that would unfairly disadvantage remaining shareholders."

59.     However, as of October 31, 2015, just five weeks earlier, the Fund reported in its annual Certified Shareholder Report:

> **Liquidity risk:**
>
> The Funds hold investments in private debt instruments, restricted securities, and securities having substantial market and/or credit risk which may be difficult to sell at certain periods of time and thus may not be able to dispose of at the value the Fund places on them. At October 31, 2015, the percentages of total net assets of such securities in each Fund as determined by the Adviser are: ... **Third Avenue Focused Credit Fund, 13.40%** (emphasis added).

This disclosure by the Fund that it had only 13.40% of illiquid assets shortly before it was forced to close for redemptions due to illiquidity demonstrates that Defendants—the Board and Third Avenue Management—breached their duties to accurately measure and monitor the Fund's liquidity.   Their estimation of the liquidity of the Fund's assets was significantly off-base considering that the Fund was forced to shut weeks later.    According to Mercer E. Bullard, a former SEC lawyer and current professor at the University of Mississippi School of Law, "There is a line that that board could have crossed by not ensuring that the fund had adequate liquidity."

60.     Defendants knew or should have known that they had invested the Fund deeply in non-public, illiquid securities.  For example, the Fund's financial statements show that it held 30% or more of Rule 144A securities, which are not publicly traded. Rule 144A securities trade,

if at all, among qualified institutional investors.  Such markets are highly illiquid, so the Board should have been monitoring the Fund's investment in these securities very carefully for their illiquidity potential.

61.     But, as of April 30, 2015, the Fund reported that it held approximately $691 million of Rule 144A securities out of $2.46 billion of net assets, or 28% of the Fund.  The Fund also reported that it had approximately $106 million of securities that were subject to restrictions on resale, or 4% of the net assets.  Together, these assets appear to have exceeded the 12.22 % of "illiquid" assets specifically disclosed by the Fund.

62.     The Fund also held approximately $209 million of bank loans.  The settlement periods for bank loans are longer than the settlement periods for fixed income securities such as high-yield bonds, which typically settle in three days.  This delayed settlement period, which can last up to 12 days, can and often does cause a potential liquidity mismatch for mutual funds offering daily liquidity.

63.     Over the next several months, from April 2015 through December 2015, the Fund also experienced sizable losses from impairments to its assets that it exited.  These impairments were disclosed in the Fund's annual Certified Shareholder Report that was filed after the Fund had already shut down.

64.     Despite these holdings, and the difficult conditions for the Fund of increasing investor redemptions and illiquidity in the markets for its investments, the Fund did not sufficiently manage its liquidity.   Instead of putting aside all cash from its sales and foregoing new purchases, the Fund took on several new large sizeable Rule 144A distressed bond positions.

E.    **The Fund's Liquidity Was at Risk Since June 2013**

65.    In June 2013, the fixed income markets experienced increased volatility as investors considered the prospect of a tapering of the Federal Reserve Board's quantitative easing program and a general rise in interest rates. This month of extreme volatility in the fixed income markets led to enormous outflows of investor money from mutual funds. This volatility in the fixed income markets has continued as Puerto Rico's $70 billion of municipal debt has collapsed, the Detroit bankruptcy lingers, other municipalities have experienced problems, and the threat of an interest rate hike hangs over all .

66.    The SEC responded by issuing the 2014 Fixed Income Guidance Update in direct response to the volatile fixed income markets. The 2014 Fixed Income Guidance Update even directly warned fund managers that they needed to monitor and manage their potential illiquidity in the face of increasing investor redemptions and illiquidity in the markets.

67.    As cited above, the 2014 Fixed Income Guidance Update recommended that funds conduct stress tests, review their practices, and communicate with their boards and shareholders. This SEC recommendation put Defendants on notice that they needed to rigorously manage their liquidity in an increasingly illiquid environment with increasing redemption demands, and that they needed to accurately communicate these risks to shareholders. Defendants, however, never did so.

68.    Throughout 2014 and most of 2015, these same issues raised by the SEC in the 2014 Fixed Income Guidance Update were widely discussed and reported in the news:

- Seeking Alpha, *High-Yield Bonds: Do Current Risks Outweigh Returns?*, by George Putnam, February 13, 2014 -- Defaults will begin to increase soon. The high-yield bond market is very sensitive to Federal Reserve announcements regarding tapering of bond purchases and raising rates, experiencing both "sharp declines" and quick recoveries. "I feel that the longer the current boom in high yield continues, the greater risk of negative surprises," current holders are "not being paid enough to take on these risks."

19

- <u>Seeking Alpha</u>, *It Is Time To Sell (Not So) High Yielding Bonds*, by Brenden O'Boyle, May 13, 2013 -- "High yielding bonds are a rather volatile asset class and losses experienced by holders of high yielding bonds in 2008 were nearly as severe as for investors in stocks."

- <u>The Economist</u>, *High-yield bonds – An appetite for junk*, from the print edition, October 19, 2013 -- "But not all is sunny in the high-yield world. Although the market has doubled or triples in size since 2008, liquidity has diminished . . .PIMCO, a huge bond-fund manager, said in a recent report, '[w]e see reduced liquidity as an important secular (three- to five-year) trend . . . [which] will result in higher volatility in times of stress.' In other words, if investors ever lose their current enthusiasm for high-yield bonds, they will find it much harder, and probably costlier, to offload them."

- <u>Barron's</u>, *Junk-Bond Returns Top 7% For 2013*, by Michael Aneiro, December 11, 2013--"[S]ome see more downside than upside in the high-yield market after several years of gains, nothing that credit risk is going to come back with a vengeance eventually..."

- <u>Seeking Alpha</u>, *Why Income Investors Should Be Watching High Yield Bond ETFs*, by David Fabian, July 17, 2014 -- "Summary – High yield bonds ETFs are starting to show signs of weakness that may mark a turning point. Recent Federal Reserve comments point to the potential of a bubble in high yield bonds."

- <u>Investment News</u>, *For fund managers, high-yield pullback comes with liquidity risks*, by Trevor Hunnicutt, August 4, 2014 -- Money is "still pouring out" of high-yield bond funds, during the past three weeks, "investors have pulled $5.5 billion." Regulators, fund managers, and market participants alike "worry that high-yield – and other bond market sectors – could become more treacherous as a growing retail segment looks to withdraw money just as core liquidity providers have stepped out of the market." The article refers to the current "lower liquidity environment" and draws comparisons to past "redemption cycles." After the 2013 "taper tantrum" the SEC advised fund firms to conduct "additional stress tests on liquidity."

- <u>Financial Times</u>, *Unwary yield hunters risk liquidity trap – Sell early to avoid rush for high-yield exit as Fed QE ends*, by Alberto Gallo, August 11, 2014 -- "Yields are near record lows and liquidity in secondary markets is declining, making it harder to exit swiftly. Reducing exposure earlier could be a wise decision." ... "Regulators have already raised red flags. The International Monetary Fund highlighted weaknesses in high-yield bonds and leveraged loans in its latest assessment of the US economy, warning of 'a tail risk where there was a precipitous attempt by investors to exit certain markets – perhaps exacerbated by outflows from ETFs and mutual funds as well as near-term market illiquidity.'"..."High-yield bonds have sold off over the past few days, but could get even worse if the Fed turns more hawkish. Liquidity in secondary markets is evaporating, and policy makers are shifting their focus to credit markets."

- BlackRock Blog, *What's Driving the Recent High Yield Sell-Off?*, by Matthew Tucker, August 12, 2014 -- "In the past few weeks we have seen some cracks in the high yield picture. Elevated geopolitical risk, an Argentina default and US jobs report that was weak relative to expectations contributed to the sell-off. . . From June 30[th] to August 6[th], high yield bond ETFs experienced $3.7 billion of redemptions...since June 30[th], the high yield bond market has lost about 2%. . . The recent sell-off is also a good reminder to investors of the potential volatility of the asset class."

- Barron's, *Pimco Redemptions Threaten High Yield, EM Bonds – Janney*, by Michael Aneiro, September 29, 2014 -- Barron's quotes Janney Montgomery Scott's chief fixed-income strategist, Guy LeBas, "Where there are risks are in illiquid products. As redemptions hits PIMCO, their funds will need to sell some portion of US high yield...[which] have naturally lower liquidity levels."

- Financial Times, *Headwinds to slow US high-yield debt sales*, by Vivianne Rodrigues and Andrew Bolger, January 8, 2015 -- The outlook for high-yield debt sales "in the next coming months is much less rosy. . . .The relentless drop in oil prices and a spike in market volatility in the past quarter has weighed heavily on high-yield debt. The rise in yields to multiyear highs has failed to attract new buyers, with funds and exchange traded funds investing in the bonds experiencing hefty redemptions and pushing borrowing costs up."…"'High-yield volatility and supply are fairly well correlated, and we anticipate a more volatile high-yield market [in 2015],' Barclays analysts say in a note to clients."

69.     Based on the volume of news reported, as well as stated regulatory concerns, Defendants knew or should have known these trends and conditions in the markets and business in which they operated. The Fund and its investors relied on Defendants to manage and monitor the risks from these events and had a substantial financial stake in their doing so properly.

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

70.     In view of the known increasing illiquidity in fixed income markets, as well as increasing investor redemptions from funds, Defendants breached their fiduciary duties to the Fund by failing to sufficient manage and plan for the Fund's liquidity and caused the Fund to violated Section 22(e) of the Act and SEC rules and regulations. Their acts and failures amount to willful misconduct and/or gross negligence. As a result of their breaches, the Fund was forced to cease operations and close for redemptions and business due to its illiquidity. In short,

21

Defendants' willful misconduct and/or gross negligence killed the Fund, causing it to incur substantial damages.

71.    Specifically, Defendants failed to sell sufficient assets to cover known increasing redemption demands while those assets were still salable.   The Fund failed to maintain sufficient cash reserves or "go to cash" as its Statements of Additional Information had provided that it would do if necessary.

72.    Defendants also failed to appropriately assess and manage the liquidity of the assets it held on its books.   The Fund held large percentages of Rule 144A and other illiquid debt.   Defendants knew that the Fund's assets were experiencing impairments and that the markets for its investments were disappearing.   Defendants failed to sufficiently monitor and assess the liquidity risk of the assets held by the Fund and to plan for those assets' illiquidity.

73.    Defendants further made additional purchases for the Fund of Rule 144A debt or other illiquid and/or potentially illiquid assets in the market after they knew or should have known that the Fund should not be investing in more assets that were ripe to become illiquid.

74.    Defendants also conducted regular conference calls with financial and investment advisors and customers invested in the Fund.   During these calls, the financial and investment advisors were assured that the Fund had sufficient liquidity to meet redemptions, and that there was no risk or issue of concern.   These calls, however, seem to have had no basis in reality.

75.    In sum, Defendants breached their fiduciary and/or contractual duties to the Fund and wasted corporate assets.   The Fund and its investors have suffered and will suffer substantial losses of more than $500 million as a result of these breaches.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

76.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

77.     Plaintiff brings this action derivatively for the benefit of the Fund to redress injuries suffered and injuries that continue to be suffered as a direct and proximate result of the misconduct alleged herein.  The Trust is named as a nominal defendant solely in a derivative capacity.

78.     Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing and prosecuting their rights.

79.     Plaintiff Engel has made a substantial investment in the Fund.  He owned his shares continuously throughout the period in which Defendants' wrongful acts occurred, and he continues to own his shares, thus giving him standing to pursue this action.

80.     This action is not being used by Plaintiff to gain any personal advantage, nor does Plaintiff maintain any personal agenda other than seeking to remedy the wrong that has been done.  To this end, Plaintiff has taken steps to file this action and has retained counsel experienced in derivative litigation and corporate governance actions.

81.     Plaintiff did not make a demand on the Trust to take remedial action on behalf of the Fund against the Defendants because such a demand would have been a futile, wasteful, and useless act.  The Board members themselves participated in, approved, and/or permitted the wrongs alleged herein and concealed and disguised those wrongs—that is, the Board members are the individual Defendants in this action who were responsible for managing, monitoring and planning for the Fund's liquidity under SEC rules and regulations and disclosures in the Fund's registration statements and prospectuses and who failed utterly to do so.  It was acts and grossly negligent management decisions that constitute the breaches of fiduciary duty that harmed shareholders.

23

82.    Additionally, the Board is also comprised nearly all of the senior officers of Third Avenue Management, the Fund's Investment Advisor.  Thus, the Board of Trustees and Third Avenue Management are controlled by the same persons, the individual Defendants.  The chart below shows the overlap:

| NAME | CAPACITY WITH TRUST | CAPACITY WITH ADVISOR |
| --- | --- | --- |
| Martin J. Whitman | Chairman | Founder and Portfolio Manager |
| David M. Barse | President and CEO | CEO |
| Vincent J. Dugan | Treasurer and CFO | COO and CFO |
| W. James Hall | General Counsel and Secretary | General Counsel and Secretary |
| Joseph J. Reardon | Chief Compliance Officer | Chief Compliance Officer |
| Michael A. Buono | Controller | Controller |

83.    Third Avenue Management, the Fund's advisor, and its senior officers were directly responsible for the day-to-day management of the Fund, including all investment advice and management of the Fund's assets and liquidity.  As such, the same persons, the individual Defendants, also participated in the day-to-day management and decisions comprising the breach of fiduciary duty to the Fund.

84.    It would therefore be futile to make a demand on the Trust to sue themselves in their capacity as actors for Third Avenue Management, the Fund's Investor Advisor.

85.    Defendants are personally and directly conflicted by their actions such that they could not have been reasonably expected to respond to a demand in good faith.  Defendants are not disinterested parties and lack sufficient independence to exercise business judgment in the best interests of the shareholders as alleged herein.

86.    For the foregoing reasons, demand is excused under applicable law.

## COUNT I

### BREACH OF FIDUCIARY DUTIES
### (Against All Defendants)

87.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

88.    Defendants, who were the Board of Trustees members and the Investor Advisor to the Fund, owed fiduciary duties of care and loyalty to the Fund in managing its affairs.  These duties are and were set forth in the Trust Agreement and the Trust's SEC filings.

89.    As alleged above, Defendants each breached their fiduciary duties to the Fund through willful misconduct and/or gross negligence.

90.    Plaintiff did not make demand on the Board because such demand would be futile.  The Board of Trustees, which also controls the Investment Advisor, is made up of the primary wrongdoers who engaged in these breaches of fiduciary duty.

91.    As a direct and proximate result of the breaches of fiduciary duty by Defendants, the Fund has sustained substantial harm and damage.

92.    Defendants are liable to the Fund as a result of the acts alleged herein.

93.    There is no adequate remedy at law.

## COUNT II

### BREACH OF CONTRACT
### (Against Defendant Third Avenue Management)

94.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

95.     Defendant Third Avenue Management had an Advisory Agreement with the Trust for the Fund which provided, under Article 2(b) that:

> In the performance of its duties under this Agreement, the Adviser shall at all times use all reasonable efforts to conform to, and act in accordance with, any requirements imposed by (i) the provisions of the Investment Company Act of 1940, as amended (the "Act"), and of any rules or regulations in force thereunder; (ii) any other applicable provisions of law; (iii) the provisions of the Trust Instrument and By-Laws of the Trust, as such documents are amended from time to time; (iv) the investment objective, policies and restrictions applicable to the Fund as set forth in the Fund's Prospectus (including its Statement of Additional Information) and (v) any policies and determinations of the Board of Trustees of the Trust.

96.     By reason of the willful and/or grossly negligent misconduct alleged herein, defendant Third Avenue Management breached these contractual duties owed to the Fund.

97.     These breaches caused proximate harm to the Fund.

98.     There is no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment on behalf of the Fund against the Defendants, jointly and severally, as set forth herein, as follows:

(i)      Declaring that this action is a proper derivative action;

(ii)     Ordering each of the Defendants to pay restitution and/or compensatory damages in favor of the Fund, plus prejudgment interest;

(iii)    Ordering that Third Avenue Management return all management fees, broker/dealer fees and other fees paid by the Fund during the period that it breached its fiduciary duties;

(iv)    Awarding Plaintiff his costs and disbursements and reasonable allowances for fees of Plaintiff's counsel and experts and reimbursement of expenses; and

(v)     Granting Plaintiff and the Fund such other and further relief as the Court may deem just and proper.

26

## DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial for any and all Counts for which a trial by jury is permitted by law.

ZAMANSKY LLC

By: /s/ Samuel E. Bonderoff
Samuel E. Bonderoff

Jacob H. Zamansky
Edward H. Glenn Jr.
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177
samuel@zamansky.com

27