## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILLIAM ENGEL, | No. 1:16-cv-01118-PKC |
| Plaintiff, | |
| vs. | **AMENDED DERIVATIVE COMPLAINT** |
| | **DEMAND FOR JURY TRIAL** |
| THIRD AVENUE MANAGEMENT COMPANY LLC, MARTIN J. WHITMAN, DAVID M. BARSE, WILLIAM E. CHAPMAN, II, LUCINDA FRANKS, EDWARD J. KAIER, ERIC P. RAKOWSKI, MARTIN SHUBIK, CHARLES C. WALDEN, and PATRICK REINKEMEYER, | |
| Defendants, | |
| THIRD AVENUE TRUST, a Delaware Business Trust, | |
| Nominal Defendant. | |

## AMENDED DERIVATIVE COMPLAINT

Plaintiff William Engel ("Engel"), by and through his undersigned counsel, alleges as follows on information and belief:

### NATURE OF THE CASE

1.      This is a shareholder derivative action brought by an investor in, and on behalf of, the Third Avenue Focused Credit Fund (the "Fund") to recover approximately $500 million of losses and other damages sustained as a direct result of Defendants' failure to comply with their most fundamental and basic duty—to manage and maintain sufficient liquidity for the Fund to stay open and in business.

2.      Section 22(e) of the Investment Company Act of 1940 (the "Act") provides that, absent "unusual circumstances," no open-end fund shall suspend the right of redemption for more than seven days.   Defendants, who include the Fund's Board of Trustees as well as its Investment Advisor, utterly failed to ensure that the Fund had sufficient liquidity to allow this right of redemption to be preserved, and thereby breached their most fundamental and basic fiduciary and contractual duties owed to the Fund.

3.      On December 9, 2015, Third Avenue Management LLC ("Third Avenue Management"), the Fund's Investment Advisor, issued a letter to investors notifying them that the Board had adopted a Plan of Liquidation for the Fund.   The letter stated that the Fund was no longer accepting redemptions or subscriptions and that its assets were being placed into a liquidating trust for sale over time.   The reason for such radical action, according to the letter, was that "[i]investor requests for redemption, in addition to the general reduction of liquidity in the fixed income markets, have made it impracticable for [the Fund] going forward to create sufficient cash to pay anticipated redemptions without resorting to sales at prices that would unfairly disadvantage remaining shareholders."   In other words, the Fund would close its doors and its assets would be sold off in a fire sale.

4.      This extreme action resulted from Third Avenue Management's and the Board's willful and/or grossly negligent breaches of fiduciary and contractual duties starting in June 2013 through the Fund's purported closure on December 9, 2015.   By failing to plan for and maintain the liquidity of the Fund to ensure that the right of redemption was not abridged, Defendants breached those legal duties in contravention of the Act and federal securities regulations as well as the Fund's registration statements and prospectuses.

5.      Throughout this time period, Defendants knew or should have known that the Fund and its sector faced increased demands by investors for redemption, and that there was increasing illiquidity in the fixed income markets in which the Fund's assets traded.  Defendants' failure to plan and prepare for the Fund's entirely foreseeable liquidity crisis killed the Fund. Yet, while the Fund's assets deteriorated, Defendants insisted that the Fund was sufficiently liquid to forestall further redemptions.  Defendants should compensate the Fund for the losses their breaches have caused the Fund and its investors.

6.      In August 2009, the Fund was first offered to investors.  It was offered as a separate investment "Series" or class of shares issued by Third Avenue Trust (the "Trust"), which is registered with the Securities and Exchange Commission ("SEC") as an open-end investment company under the Act.  The Fund is managed by its Board, which hired Third Avenue Management as the Fund's Investment Advisor.  The individual Defendants compose the Board of Trustees and bear direct responsibility for the harm that has befallen the Fund.

7.      The Fund's investment strategy has been to invest primarily in distressed and high-yield debt and credit-related investments.  It was launched by Third Avenue Funds, which manages a family of mutual funds and private client accounts and has over $10 billion of customer funds under management.  The Fund was the only mutual fund offered by Third Avenue that had a strategy of investing in non-publicly-traded investments.

8.      The Fund was an open-end investment company.  Section 22(e) of the Act provides that no open-end fund shall suspend the right of redemption for more than seven days absent specific unusual circumstances that are not present here.   The SEC's position has been that open-end funds should maintain a high degree of portfolio liquidity to ensure that their portfolio securities and other assets can be sold, and the proceeds used to satisfy redemptions, in

a timely manner in order to comply with Section 22(e).  The SEC has adopted a requirement limiting funds to only 15% of illiquid assets, and it has issued repeated guidance advising fund managers that they must maintain liquidity to meet redemptions even if their investment strategy involves trading illiquid investments.

9.      In its registration statements, prospectus and statement of additional information, the Fund represented that it would meet investors' redemption requests without qualification, that it would limit illiquid securities to 15% of its assets, and that it would comply with the Act and SEC rules and regulations.  Accordingly, to comply with its regulatory requirements, the Fund had to adopt a plan to manage its liquidity—which, in turn, was supposed to have been actively monitored by the Board of Trustees.

10.      Since June 2013, the fixed income markets have become increasingly volatile and illiquid.  Investors have also increasingly sought to redeem their money from fixed income funds.  In response, the SEC issued specific warning and guidance to fund managers on liquidity risk monitoring, managing and planning.  This warning and guidance put Defendants on specific notice that, without prophylactic action, the Fund was at risk for a liquidity crisis, and that Defendants needed to actively and prudently monitor and manage the Fund's liquidity to prevent such a crisis's occurrence.

11.      As the illiquidity in fixed income markets and increased investor redemptions grew, Third Avenue Management evidently ignored these warning signs and instead invested the Fund deeply in numerous assets that are not publicly traded and therefore present significant potential liquidity problems.  For example, the Fund has invested in large positions of distressed bonds and notes which, according to the Fund's financial statements, are Rule 144A securities that may only trade among qualified institutional buyers.  There is no liquid, public market for

4

these securities.  The Fund also invested in positions of bank loans, which have delayed or longer settlement dates, so that they, too, cannot realize immediate redemptions.

12.     Defendants, who were responsible for managing the Fund's liquidity so that it could make redemptions upon demand yet remain in business, willfully or grossly negligently breached their fiduciary and contractual duties to investors when they failed in this responsibility.  Their failures resulted in the Fund's closure and forced liquidation.  Following the SEC's warning, Defendants failed to sufficiently monitor, manage and plan for the Fund's liquidity in view of known increased illiquidity in the markets for the Fund's assets and the increased likelihood of investor redemptions.

13.     Defendants failed to sell, while those assets were salable, sufficient Fund assets to cover likely redemption demands before large declines in the prices of the Fund's assets made such sales virtually impossible.  Defendants failed to "go to cash," which the Fund's prospectus represents it will do at times.  Defendants also made additional purchases of Rule 144A debt securities at a time when they knew or should have known that the Fund should not be investing in more assets that were illiquid or ripe to become so.

14.     Defendants also represented to investors that the Fund held below 15% of "illiquid securities," a highly dubious representation given the rapid deterioration and closure of the Fund.   In any event, whether the Fund was above or below its "illiquid securities" threshold—however Defendants self-servingly chose to define liquidity at the time—the Fund was clearly not sufficiently liquid to meet the redemption requests that had been building over the prior two years.

15.     As a result of Defendants' willful and grossly negligent breaches of fiduciary and contractual duties, the Fund has been substantially harmed.  It has suffered at least $500 million

in losses and will suffer additional losses as its assets are liquidated at fire-sale prices.  The Fund paid substantial management fees to Third Avenue Management that were not deserved due to Defendants' failures to comply with the Act, SEC rules and regulations, and provisions in the Fund's prospectus and registration statements.

16.     Through this action, Plaintiff seeks to recover on behalf of the Fund for these and other losses caused by the Defendants' willful and/or grossly negligent breaches of fiduciary and contractual duties.

17.     Demand has not been made and is excusable under applicable law because the Board upon which demand would be made is made up of the individual Defendants in this action, who, as Trustees of the Fund, ignored numerous "red flags" regarding the growing illiquidity of the Fund and its inability to meet its redemption obligations, and who consciously and/or recklessly disregarded their fiduciary duties in allowing these deleterious circumstances to eventuate.  Thus, because the Trustees were directly responsible for the misconduct alleged herein, any demand that they sue themselves for their own wrongful acts would be futile.

## JURISDICTION AND VENUE

18.     The Court has jurisdiction over this action pursuant 28 U.S.C. §1332 because, upon information and belief, there is complete diversity of citizenship among the parties.  (*See* Dkt. No. 1.)  Additionally, the amount in controversy in this case exceeds $75,000.  This case is not a collusive action to confer jurisdiction that the Court would otherwise lack.

19.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because the conduct complained of occurred in this District and Defendants have their principal place of business in this District.

# PARTIES

## A.   PLAINTIFF

20.     Plaintiff William Engel is and has been a shareholder of the Fund since September 2009, and is a resident of Putney, Vermont.   He also currently holds his shares in the Fund, and he has held these shares continuously throughout the period of the alleged misconduct.

## B.   NOMINAL DEFENDANT

21.     Nominal Defendant the Trust is a Delaware Business Trust with a principal office located at 622 Third Avenue, New York, New York.  The Trust has a Board of Trustees that manages its operations and is also responsible for the management of the Fund.

## C.   DEFENDANTS

22.     Defendant Third Avenue Management is a limited liability company organized in New York, with a principal office located at 622 Third Avenue, New York, New York.  Third Avenue Management is a registered investment adviser with the SEC, and it is both the Trust's and Fund's Investment Advisor.

23.     Martin J. Whitman is the Chairman of the Board of the Trust, and a Founder and Co-Chief Investment Officer of Third Avenue Management.  His principal place of business is at 622 Third Avenue, New York, New York.

24.     Until recently, David M. Barse was President and Chief Executive Officer of the Trust, and Chief Executive Officer of Third Avenue Management.  Upon information and belief, Mr. Barse was also a member of the Third Avenue Trust's Board of Trustees.  His principal place of business was at 622 Third Avenue, New York, New York.

25.     William E. Chapman, II is and has been during the relevant period a Trustee of Third Avenue Trust.  Upon information and belief, Mr. Chapman is President and Owner of Longboat Retirement Planning Solutions, which has its principal place of business in Chicago,

Illinois.  Mr. Chapman is also the independent chairman and trustee of the AMG Fund company, which holds a majority stake in Third Avenue.

26.     Lucinda Franks is and has been during the relevant period a Trustee of Third Avenue Trust.  Upon information and belief, Ms. Franks resides in New York, New York.

27.     Edward J. Kaier is and has been during the relevant period a Trustee of Third Avenue Trust.  Upon information and belief, Mr. Kaier is a partner at the law firm of Teeters Harvey Marrone & Kaier LLP, which has its principal place of business at 1835 Market Street, Philadelphia, Pennsylvania 19103-2968.

28.     Eric P. Rakowski is and has been during the relevant period a Trustee of Third Avenue Trust.  Upon information and belief, Mr. Rakowski is a professor at the University of California – Berkeley.  He currently resides in California.

29.     Patrick Reinkemeyer is and has been since January 2015 a Trustee of Third Avenue Trust.  Upon information and belief, Mr. Reinkemeyer replaced former Trustee Jack Aber on the Board and as a member of the Board's Audit Committee.  Mr. Reinkemeyer is the founder of SilverPepper Funds, which has its principal place of business in Lake Forest, Illinois.

30.     Martin Shubik is and has been during the relevant period a Trustee of Third Avenue Trust.  Mr. Shubik served on the Board's Audit Committee.  Upon information and belief, Mr. Shubik is a professor at Yale University in New Haven, Connecticut, and currently resides in Connecticut.

31.     Charles C. Walden is and has been during the relevant period a Trustee of Third Avenue Trust.  Mr. Walden served on the Board's Audit Committee.  Upon information and belief, Mr. Walden is the Chief Investment Officer of the Knights of Columbus, which has its principal place of business in New Haven, Connecticut.

32.     Defendants Whitman, Barse. Chapman, Franks, Kaier, Rakowski, Reinkemeyer, Shubik and Walden are referred to collectively as the "Trustees" or the "Trustee Defendants."

### SUBSTANTIVE ALLEGATIONS

**A.     Background**

33.     In 1986, Third Avenue Funds was founded by Martin Whitman, an outspoken value investor, and it now manages a family of at least seven mutual funds and private client accounts and has over $10 billion of customer funds under management.

34.     In August 2009, the Fund was first offered to investors.  It was offered as a separate investment "Series" or class of shares established under Article 2.1 of the Trust Agreement of the Trust dated October 29, 1996.

35.     The Trust is registered with the SEC as an open-end investment company under the Act.  The Fund's shares were issued by the Trust and it is managed by its Board of Trustees, which is made up of the individual Defendants.  The Board, in turn, hired Third Avenue Management as the Fund's Investment Advisor.

36.     The Fund's investment strategy is to invest primarily in distressed and high-yield debt and credit-related investments.  Unlike the other funds offered by Third Avenue, the Fund had a strategy that included investing in non-publicly-traded investments.

37.     Since its launch in August 2009, the Fund's assets grew rapidly.  The Fund quickly raised over $700 million by the end of 2010, grew beyond $1 billion in 2013, and subsequently peaked at nearly $3 billion in assets.  As of October 31, 2015, the Fund had approximately $1 billion in assets (shortly before it closed).

38.     As a result of the Fund's growth, Third Avenue Management has received substantial fees based on the size of the Fund as of October 31:

2009:           $198,311 (after two months of operation)

2010:        $5,281,680

2011:        $8,376,215

2012:        $7,609,834

2013:        $9,101,101

2014:        $21,083,384

2015:        $6,875,000  (estimated based on known assets)

39.    In total, since its inception, Third Avenue Management has received at least approximately **$58 million** in fees for managing the Fund.

**B.**    **SEC Liquidity Requirements**

40.    The Fund was registered as an open-end investment company.  Section 22(e) of the Act provides that no open-end fund shall suspend the right of redemption or postpone the date of payment of redemption proceeds for more than seven days after tender of the security absent specified unusual circumstances.  In Release No. 33-9922, IC-31835, 17 CFR 210, 270, 274 (Sept. 22, 2015), the SEC issued a notice entitled "*Open-End Fund Liquidity Risk Management Programs; Swing Pricing; Re-Opening of Comment Period for Investment Company Reporting Modernization Release* (the "Proposed Rule),"  which set forth proposed rules for mutual fund liquidity.  In footnote 77, the SEC states that there may be liability for a mutual fund's failure to meet redemptions within seven days or any shorter period disclosed in the prospectus.

41.    Under current SEC guidelines, a portfolio security or other asset is considered illiquid if it cannot be sold or disposed of (rather than settled) in the ordinary course of business within seven days at approximately the value at which the fund has valued the investment.

42.     Additionally, Rule 15c6-1 under the Securities Exchange Act of 1934 impacts the timing of open-end fund redemptions because the rule requires broker-dealers to settle securities transactions, including transactions in open-end fund shares, within three business days after the trade date.   Furthermore, Rule 22c-1 under the Act, the "forward pricing" rule for mutual funds, requires funds, their principal underwriters, and dealers to sell and redeem fund shares at a price based on the current Net Asset Value ("NAV") next computed after receipt of an order to purchase or redeem fund shares, even though fund assets may be sold in subsequent days to meet redemption obligations.   Therefore, there are a number of statutory and regulatory provisions that must be considered in assessing a fund's ability to meet redemptions and mitigate potential dilution of shareholders' interests.

43.     Historically, the SEC has taken the position that open-end funds should maintain a high degree of portfolio liquidity to ensure that their portfolio securities and other assets can be sold and the proceeds used to satisfy redemptions in a timely manner to comply with section 22(e).  The SEC also has stated that open-end funds have a "general responsibility to maintain a level of portfolio liquidity that is appropriate under the circumstances," and to engage in ongoing portfolio liquidity monitoring to determine whether an adequate level of portfolio liquidity is being maintained in light of the fund's redemption obligations.  *See* Revisions of Guidelines to Form N-1A, Investment Company Act Release No. 18612 (Mar. 12, 1992) [57 FR 9828 (Mar. 20, 1992)] ("Guidelines Release").

44.     In addition to the importance of adequate liquidity, SEC guidelines generally limit an open-end fund's aggregate holdings of "illiquid securities" to 15% of a fund's net assets. Under the 15% guideline, a portfolio security or other asset is considered illiquid if it cannot be sold or disposed of in the ordinary course of business within seven days at approximately the

value at which the fund has valued the investment.  The 15% guideline has generally caused funds to limit their exposures to those types of securities that cannot be sold within seven days and that the SEC has indicated may be illiquid, such as private equity securities, securities purchased in an initial public offering, and certain other privately placed or other restricted securities as well as certain instruments or transactions not maturing within seven days.

45.     The SEC has not established a set of required factors that must be considered when assessing the liquidity of securities, but it has provided "examples of factors that would be reasonable for a board of directors to take into account with respect to a rule 144A security (but which would not necessarily be determinative)."  These factors include:  the frequency of trades and quotations for the security; the number of dealers willing to purchase or sell the security and the number of other potential purchasers; dealer undertakings to make a market in the security; and the nature of the security and the nature of the marketplace in which it trades, including the time needed to dispose of the security, the method of soliciting offers, and the mechanics of transfer.  *See* Statement Regarding "*Restricted Securities*," Investment Company Act Release No. 5847 (Oct. 21, 1969) [35 FR 19989 (Dec. 31, 1970)] ("Restricted Securities Release").

46.     Under Rule 38a-1 of the Act, open-end funds are also required to adopt and implement written policies and procedures reasonably designed to prevent violations of the federal securities laws.  A fund's compliance policies and procedures should be appropriately tailored to reflect each fund's particular compliance risks.  The SEC has stated that an open-end fund holding a significant portion of its assets in securities with long settlement periods or with infrequent trading, for instance, may be subject to relatively greater liquidity risks than other open-end funds, and should appropriately tailor its policies and procedures to comply with its redemption obligations.

47.     In the Restricted Securities Release, the SEC recognized that a fund may need to determine whether it is appropriate to take certain actions when it has determined that a previously liquid holding has become illiquid due to changed circumstances:  "Because open-end companies hold themselves out at all times as being prepared to meet redemptions within seven days, it is essential that such companies maintain a portfolio of investments that enable them to fulfill that obligation. This requires a high degree of liquidity in the assets of open-end companies because the extent of redemption demands or other exigencies are not always predictable."

48.     The SEC has further stated that a fund experiencing net outflows due to shifts in market sentiment may wish to consider reducing its illiquid asset holdings to maintain adequate liquidity.  *See* Guidelines Release.

49.     Moreover, in January 2014, the SEC issued specific guidance on policies that funds should use to management liquidity in IM Guidance Update 2014-1, *Risk Management in Changing Fixed Income Market Conditions* (Jan. 2014), *available at* http://www.sec.gov/divisions/investment/guidance/im-guidance-2014-1.pdf   ("2014 Fixed Income Guidance Update"):

**III. *Risk Management and Disclosure***

Given the potential fixed income market volatility, which may be exacerbated by changes in bond market size and structure discussed above, the Division of Investment Management staff notes the following steps  that fund advisers may consider taking:

*Assess and Stress Test Liquidity*

Consistent with Section 22(e) of the Investment Company Act of 1940, fund advisers generally assess overall fund liquidity and funds' ability to meet potential redemptions over a number of periods.  In light of potential market volatility, fund advisers may consider assessing fund liquidity needs during both normal and stressed environments, including assessing their sources of liquidity (such as cash holdings and other assets that would not require selling into declining or dislocated markets if volatility or market stress

increases). The assessments may include, for example, needs and sources of fund liquidity over 1 day, 5 days, 30 days, and potentially longer periods.

*Conduct More General Stress-Tests/Scenario Analyses*

Fund advisers may consider assessing the impact (beyond just liquidity) of various stress-tests and/or other scenarios on funds. For example, they may consider stress-tests involving interest rate hikes, widening spreads, price shocks to fixed income products, increased volatility and reduced liquidity, among other factors.

*Risk Management Evaluation*

Fund advisers may want to consider using the outcomes of any assessments, analyses, and conversations to evaluate what risk management strategies and actions are most appropriate, if any, in response to changing fixed income market conditions at a fund and/or the complex level. These may include decisions around portfolio composition, concentrations, diversification and liquidity, among other factors.

*Communication with Fund Boards*

Fund advisers may consider what information should be provided to fund directors so that they are informed of the risk exposures and liquidity position of the fund, and the fund's ability to manage through changing interest rate conditions and potentially increased fixed income market volatility.

*Shareholder Communications*

Funds should also assess the adequacy of their disclosures to shareholders in light of any additional risks due to recent events in the fixed income markets and the potential impact of tapering quantitative easing and/or rising interest rates, including the potential for periods of volatility and increased redemptions. If a fund determines that its risk disclosure to shareholders is not sufficient in light of these recent events, the fund should consider the appropriate manner of communicating risks to shareholders (e.g., prospectus, shareholder reports).

At all times, Defendants, who controlled and managed all aspects of the Fund, had strict duties and responsibilities to comply with these SEC rules and regulations requiring the Fund to maintain its liquidity despite adverse or unexpected market conditions or investor redemption demands. Defendants also had strict duties and responsibilities to implement and monitor liquidity through a risk management program and to truthfully and accurately communicate liquidity risk to Fund investors.

14

C.    **The Fund's Representations**

50.    From the start, and until its sudden demise, the Fund has represented to investors that shares can be redeemed, that it will limit its investments in illiquid assets to 15%, that it would monitor liquidity, and that it holds liquid assets.

51.    For example, the Fund's prospectus filed on its Form NA-1 Registration Statement on August 24, 2009, provides for redemption without any qualification as follows:

**HOW TO REDEEM SHARES**

**General**

You may redeem your shares on any day during which the NYSE is open, either directly from the Fund or through certain broker-dealers or other financial intermediaries. Fund shares will be redeemed at the NAV next calculated as of a time after your order is received in good order by the Fund or its designees. Redemption requests that contain a restriction as to the time, date or share price at which the redemption is to be effective will not be honored. You can redeem less than all of your shares, but if you retain shares with a value below a minimum amount (as determined by the Adviser), your account may be closed at the discretion of the Adviser. See Redemption By The Fund.

52.    Additionally, in Statements of Additional Information filed by the Fund, the following provision is disclosed:

REDEMPTION OF SHARES

The procedure for redemption of Fund shares under ordinary circumstances is set forth in the Prospectus. In unusual circumstances, such as in the case of a suspension of the determination of NAV, the right of redemption is also suspended and shareholders will receive payment of the net asset value next determined after termination of the suspension.  The right of redemption may be suspended or payment upon redemption deferred for more than seven days: (a) when trading on the New York Stock Exchange ("NYSE") is restricted; (b) when the NYSE is closed for other than weekends and holidays; (c) when the SEC has by order permitted such suspension; or (d) when an emergency exists making disposal of portfolio securities or valuation of net assets of a Fund not reasonably practicable; provided that applicable rules and regulations of the SEC shall govern as to whether the conditions prescribed in (a), (c) or (d) exist.

53.    This provision identifies only very limited instances, which are determined by SEC rules and regulations, when the Fund will not honor redemptions.

54.     Following SEC rules and regulations, the Fund represented in its Statements of Additional Information that it would restrict its investment in illiquid securities to only 15% of Fund's assets.  The Fund also disclosed that the Board of Trustees would monitor the liquidity of any non-public or Rule 144A securities in which it invests.

55.     The following provisions are in its Statements of Additional Information:

RESTRICTED AND ILLIQUID SECURITIES

Under normal circumstances, none of the Funds will purchase or otherwise acquire any investment if, as a result, more than 15% of its net assets (taken at current market value) would be invested in securities that are illiquid. Generally speaking, an illiquid security is any asset or investment of which a Fund cannot sell a normal trading unit in the ordinary course of business within seven days at approximately the value at which a Fund has valued the asset or investment, including securities that cannot be sold publicly due to legal or contractual restrictions. The sale of illiquid securities often requires more time and results in higher brokerage charges or dealer discounts and other selling expenses than does the sale of securities eligible for trading on national securities exchanges or in the over-the-counter markets. Restricted securities may sell at a price lower than similar securities that are not subject to restrictions on resale.

Over the past several years, strong institutional markets have developed for various types of restricted securities, including repurchase agreements, some types of commercial paper, and some corporate bonds and notes (commonly known as "Rule 144A Securities").   Securities freely salable among qualified institutional investors under special rules adopted by the SEC, or otherwise determined to be liquid, may be treated as liquid if they satisfy liquidity standards established by the Board of Trustees (the "Board").  The continued liquidity of such securities may not be as well assured as that of publicly traded securities, and accordingly, the Board will monitor their liquidity.  The Board will review pertinent factors such as trading activity, reliability of price information and trading patterns of comparable securities in determining whether to treat any such security as liquid for purposes of the foregoing 15% test.   To the extent the Board treats such securities as liquid, temporary impairments to trading patterns of such securities may adversely affect a Fund's liquidity.

56.     Generally, for most of its life, the Fund did not provide any specific disclosure about the liquidity or illiquidity of its investments.  However, starting on January 6, 2015, the Fund began to disclose its percentage of "illiquid assets" in the footnotes of its financial statements filed in its semi-annual and annual Certified Shareholder Reports.   The Fund identified the following percentages:  i) Oct. 30, 2014 -- 14.25%; ii) Apr. 30, 2015 -- 12.22%;

and iii) Oct. 31, 2015 -- 13.40%.  These percentages, set by Defendants, purport to comply with SEC rules and regulations and the Fund's own restrictions on liquidity disclosures to investors.

57.     The Fund apparently began making these disclosures in response to the liquidity crisis that was affecting fixed income markets, seemingly in the hope of forestalling additional investor redemptions.  These disclosures seemed intended to assure investors that the Fund had low percentages of illiquid assets and that the Board was diligently monitoring its assets for sufficient liquidity.

**D.     The Fund's Sudden Closure**

58.     On December 9, 2015, however, Fund investors were notified that the Board had closed the Fund for redemptions and adopted a Plan of Liquidation for the Fund.  Due to the prior disclosures, this letter was shocking and nearly unprecedented for an open-end company. The largest financial wire services and news agencies all reported on the Fund's failure, including the *Wall Street Journal*, because of how extraordinary it was.

59.     The Fund's sudden closure violated SEC requirements, including Section 22(e) of the Act, and disclosures in its registration statements and prospectuses.  The limited few exceptions provided under SEC rules for "unusual circumstances" and the Fund's own policy for redemption stated in the Statement of Additional Information did not exist here.  There was no NYSE market closure or other sufficiently justifiable cause for the Fund to be forced to suspend redemptions—other than the Board's gross negligence and failure to manage its liquidity.

60.     The letter blamed the Fund's failure on "[i]nvestor requests for redemption, in addition to the general reduction of liquidity in the fixed income markets, have made it impracticable for [the Fund] going forward to create sufficient cash to pay anticipated redemptions without resorting to sales at prices that would unfairly disadvantage remaining shareholders."

61.     However, as of October 31, 2015, just five weeks earlier, the Fund reported in its annual Certified Shareholder Report:

**Liquidity risk:**

The Funds hold investments in private debt instruments, restricted securities, and securities having substantial market and/or credit risk which may be difficult to sell at certain periods of time and thus may not be able to dispose of at the value the Fund places on them. At October 31, 2015, the percentages of total net assets of such securities in each Fund as determined by the Adviser are: … **Third Avenue Focused Credit Fund, 13.40%** (emphasis added).

This disclosure by the Fund that it had only 13.40% of illiquid assets shortly before it was forced to close for redemptions due to illiquidity demonstrates that Defendants—the Board and Third Avenue Management—breached their duties to accurately measure and monitor the Fund's liquidity. Their estimation of the liquidity of the Fund's assets was significantly off-base considering that the Fund was forced to shut weeks later. According to Mercer E. Bullard, a former SEC lawyer and current professor at the University of Mississippi School of Law, "There is a line that that board could have crossed by not ensuring that the fund had adequate liquidity."

62.     Defendants knew or should have known that they had invested the Fund deeply in non-public, illiquid securities. For example, the Fund's financial statements show that it held 30% or more of Rule 144A securities, which are not publicly traded. Rule 144A securities trade, if at all, among qualified institutional investors. Such markets are highly illiquid, so the Board should have been monitoring the Fund's investment in these securities very carefully for their illiquidity potential.

63.     But, as of April 30, 2015, the Fund reported that it held approximately $691 million of Rule 144A securities out of $2.46 billion of net assets, or 28% of the Fund. The Fund also reported that it had approximately $106 million of securities that were subject to restrictions

18

on resale, or 4% of the net assets.  Together, these assets appear to have exceeded the 12.22 % of "illiquid" assets specifically disclosed by the Fund.

64.     The Fund also held approximately $209 million of bank loans.  The settlement periods for bank loans are longer than the settlement periods for fixed income securities such as high-yield bonds, which typically settle in three days.  This delayed settlement period, which can last up to 12 days, can and often does cause a potential liquidity mismatch for mutual funds offering daily liquidity.

65.     Over the next several months, from April 2015 through December 2015, the Fund also experienced sizable losses from impairments to its assets that it exited.  These impairments were disclosed in the Fund's annual Certified Shareholder Report that was filed after the Fund had already shut down.

66.     Despite these holdings, and the difficult conditions for the Fund of increasing investor redemptions and illiquidity in the markets for its investments, the Fund did not sufficiently manage its liquidity.   Instead of putting aside all cash from its sales and foregoing new purchases, the Fund took on several new large sizeable Rule 144A distressed bond positions.

**E.      The Fund's Liquidity Was at Risk Since June 2013**

67.     In June 2013, the fixed income markets experienced increased volatility as investors considered the prospect of a tapering of the Federal Reserve Board's quantitative easing program and a general rise in interest rates.  This month of extreme volatility in the fixed income markets led to enormous outflows of investor money from mutual funds.  This volatility in the fixed income markets has continued as Puerto Rico's $70 billion of municipal debt has

collapsed, the Detroit bankruptcy lingers, other municipalities have experienced problems, and the threat of an interest rate hike hangs over all.

68.     The SEC responded by issuing the 2014 Fixed Income Guidance Update in direct response to the volatile fixed income markets.  The 2014 Fixed Income Guidance Update even directly warned fund managers that they needed to monitor and manage their potential illiquidity in the face of increasing investor redemptions and illiquidity in the markets.

69.     As cited above, the 2014 Fixed Income Guidance Update recommended that funds conduct stress tests, review their practices, and communicate with their boards and shareholders.   This SEC recommendation put Defendants on notice that they needed to rigorously manage their liquidity in an increasingly illiquid environment with increasing redemption demands, and that they needed to accurately communicate these risks to shareholders.  Defendants, however, never did so.

70.     Throughout 2014 and most of 2015, these same issues raised by the SEC in the 2014 Fixed Income Guidance Update were widely discussed and reported in the news:

- Seeking Alpha, *High-Yield Bonds: Do Current Risks Outweigh Returns?*, by George Putnam, February 13, 2014 --  Defaults will begin to increase soon.  The high-yield bond market is very sensitive to Federal Reserve announcements regarding tapering of bond purchases and raising rates, experiencing both "sharp declines" and quick recoveries.  "I feel that the longer the current boom in high yield continues, the greater risk of negative surprises," current holders are "not being paid enough to take on these risks."

- Seeking Alpha, *It Is Time To Sell (Not So) High Yielding Bonds*, by Brenden O'Boyle, May 13, 2013 -- "High yielding bonds are a rather volatile asset class and losses experienced by holders of high yielding bonds in 2008 were nearly as severe as for investors in stocks."

- The Economist, *High-yield bonds – An appetite for junk*, from the print edition, October 19, 2013 -- "But not all is sunny in the high-yield world.  Although the market has doubled or triples in size since 2008, liquidity has diminished . . .PIMCO, a huge bond-fund manager, said in a recent report, '[w]e see reduced liquidity as an important secular (three- to five-year) trend . . . [which] will result in higher volatility in times of stress.'  In

other words, if investors ever lose their current enthusiasm for high-yield bonds, they will find it much harder, and probably costlier, to offload them."

- <u>Barron's</u>, *Junk-Bond Returns Top 7% For 2013*, by Michael Aneiro, December 11, 2013--"[S]ome see more downside than upside in the high-yield market after several years of gains, nothing that credit risk is going to come back with a vengeance eventually…"

- <u>Seeking Alpha</u>, *Why Income Investors Should Be Watching High Yield Bond ETFs*, by David Fabian, July 17, 2014 -- "Summary – High yield bonds ETFs are starting to show signs of weakness that may mark a turning point.  Recent Federal Reserve comments point to the potential of a bubble in high yield bonds."

- <u>Investment News</u>, *For fund managers, high-yield pullback comes with liquidity risks*, by Trevor Hunnicutt, August 4, 2014 -- Money is "still pouring out" of high-yield bond funds, during the past three weeks, "investors have pulled $5.5 billion."  Regulators, fund managers, and market participants alike "worry that high-yield – and other bond market sectors – could become more treacherous as a growing retail segment looks to withdraw money just as core liquidity providers have stepped out of the market."  The article refers to the current "lower liquidity environment" and draws comparisons to past "redemption cycles."   After the 2013 "taper tantrum" the SEC advised fund firms to conduct "additional stress tests on liquidity."

- <u>Financial Times</u>, *Unwary yield hunters risk liquidity trap – Sell early to avoid rush for high-yield exit as Fed QE ends*, by Alberto Gallo, August 11, 2014 -- "Yields are near record lows and liquidity in secondary markets is declining, making it harder to exit swiftly.  Reducing exposure earlier could be a wise decision." …   "Regulators have already raised red flags. The International Monetary Fund highlighted weaknesses in high-yield bonds and leveraged loans in its latest assessment of the US economy, warning of 'a tail risk where there was a precipitous attempt by investors to exit certain markets – perhaps exacerbated by outflows from ETFs and mutual funds as well as near-term market illiquidity."…"High-yield bonds have sold off over the past few days, but could get even worse if the Fed turns more hawkish.  Liquidity in secondary markets is evaporating, and policy makers are shifting their focus to credit markets."

- <u>BlackRock Blog</u>, *What's Driving the Recent High Yield Sell-Off?*, by Matthew Tucker, August 12, 2014 -- "In the past few weeks we have seen some cracks in the high yield picture.  Elevated geopolitical risk, an Argentina default and US jobs report that was weak relative to expectations contributed to the sell-off. . . From June 30th to August 6th, high yield bond ETFs experienced $3.7 billion of redemptions…since June 30th, the high yield bond market has lost about 2%. . . The recent sell-off is also a good reminder to investors of the potential volatility of the asset class."

- <u>Barron's</u>, *Pimco Redemptions Threaten High Yield, EM Bonds – Janney*, by Michael Aneiro, September 29, 2014 --  Barron's quotes Janney Montgomery Scott's chief fixed-income strategist, Guy LeBas, "Where there are risks are in illiquid products.  As

redemptions his PIMCO, their funds will need to sell some portion of US high yield…[which] have naturally lower liquidity levels."

- <u>Financial Times</u>, *Headwinds to slow US high-yield debt sales*, by Vivianne Rodrigues and Andrew Bolger, January 8, 2015 -- The outlook for high-yield debt sales "in the next coming months is much less rosy. . . .The relentless drop in oil prices and a spike in market volatility in the past quarter has weighed heavily on high-yield debt. The rise in yields to multiyear highs has failed to attract new buyers, with funds and exchange traded funds investing in the bonds experiencing hefty redemptions and pushing borrowing costs up."…"'High-yield volatility and supply are fairly well correlated, and we anticipate a more volatile high-yield market [in 2015],' Barclays analysts say in a note to clients."

71.     Based on the volume of news reported, as well as stated regulatory concerns, Defendants knew or should have known these trends and conditions in the markets and business in which they operated. The Fund and its investors relied on Defendants to manage and monitor the risks from these events and had a substantial financial stake in their doing so properly.

**DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES**

72.     In view of the known increasing illiquidity in fixed income markets, as well as increasing investor redemptions from funds, Defendant Third Avenue Management, led by individual Defendants Whitman and Barse, breached its fiduciary duties to the Fund by failing to sufficiently manage and plan for the Fund's liquidity and caused the Fund to violated Section 22(e) of the Act and SEC rules and regulations. These acts and failures amount to willful misconduct and/or gross negligence. As a result of these breaches, the Fund was forced to cease operations and close for redemptions and business due to its illiquidity. In short, the willful misconduct and/or gross negligence of Defendants Third Avenue Management, Whitman and Barse killed the Fund, causing it to incur substantial damages.

73.     Specifically, these three Defendants failed to sell sufficient assets to cover known increasing redemption demands while those assets were still salable. The Fund failed to

maintain sufficient cash reserves or "go to cash" as its Statements of Additional Information had provided that it would do if necessary.

74.     Defendants Third Avenue Management, Whitman and Barse also failed to appropriately assess and manage the liquidity of the assets it held on its books.  The Fund held large percentages of Rule 144A and other illiquid debt.  These Defendants knew that the Fund's assets were experiencing impairments and that the markets for its investments were disappearing. Defendants failed to sufficiently monitor and assess the liquidity risk of the assets held by the Fund and to plan for those assets' illiquidity.

75.     Defendant Third Avenue Management, led by Defendants Whitman and Barse, further made additional purchases for the Fund of Rule 144A debt or other illiquid and/or potentially illiquid assets in the market after it knew or should have known that the Fund should not be investing in more assets that were ripe to become illiquid.

76.     These Defendants also conducted regular conference calls with financial and investment advisors and customers invested in the Fund.  During these calls, the financial and investment advisors were assured that the Fund had sufficient liquidity to meet redemptions, and that there was no risk or issue of concern.  These calls, however, seem to have had no basis in reality.

77.     Not surprisingly, Defendant Barse abruptly left the firm in December 2015, just after Third Avenue's fateful letter was sent to shareholders.

78.     The Trustee Defendants likewise breached their fiduciary duties.  The Fund represents in its Statements of Additional Information filed with its registration statements that the Board was responsible for oversight of the Fund's day-to-day managers on issues of risk management and valuation and other operational matters such as liquidity management.

Board's Oversight Role in Management. The Board's role in management of the Trust is oversight. As is the case with virtually all investment companies (as distinguished from operating companies), service providers to the Trust, primarily the Adviser and its affiliates, have responsibility for the day-to-day management of the Funds, which includes responsibility for risk management (including management of investment performance and investment risk, valuation risk, issuer and counterparty credit risk, compliance risk and operational risk). As part of its oversight, the Board interacts with and receives reports from senior personnel of the Adviser, including the Chief Financial Officer, General Counsel, Chief Compliance Officer (for the Trust and the Adviser), and each Portfolio Manager. The Board's audit committee (which consists of three Independent Trustees (as defined below)) meets during its scheduled meetings, and between meetings the audit committee chair maintains contact, with the Trust's independent registered public accounting firm and the Trust's Chief Financial Officer. The Board also receives periodic presentations from senior personnel of the Adviser or its affiliates regarding risk management generally, as well as periodic presentations regarding specific operational, compliance or investment areas such as business continuity, anti-money laundering, personal trading, valuation, credit, investment research and securities lending. The Board has adopted policies and procedures designed to address certain risks to the Trust. In addition, the Adviser and other service providers to the Trust have adopted a variety of policies, procedures and controls designed to address particular risks to the Funds. The Board also receives reports from counsel to the Trust and the Adviser and the Board's own independent legal counsel regarding regulatory compliance and governance matters. The Board's oversight role does not make the Board a guarantor of the Trust's investments or activities.

79.     The Board also has a "lead independent Trustee" for the purpose of having frequent contact with senior personnel of the Adviser, including the Chief Executive Officer (who also serves as Trustee of the Trust), the Chief Financial Officer, the General Counsel, and the Chief Compliance Officer.

80.     As cited above, the Board states that it "will monitor their liquidity," referring to the Fund's investment in restricted securities, and will review factors relating to whether such securities meet the 15% liquidity test.   The Board was therefore directly responsible for the Fund's liquidity monitoring and overseeing the actions of the Advisor.

81.     The Fund also has a "Fair Valuation Committee" comprised of all the independent trustees who met regularly to review valuations determined by the Adviser of Fund positions.

During the fiscal year which ended October 31, 2014, the Fair Valuation Committee met 13 times.  It was the Fair Valuation Committee which approved the "fair value" of 16.87% of the Fund's restricted or not readily marketable securities during the fiscal year which ended October 31, 2015.  Thus, these Trustees, who met and approved the "fair values" of the Fund's restricted securities, were well aware of the Fund's illiquidity problem, yet they took no action to fix it.

82.     In addition, the Board also had an Audit Committee comprised of three of its independent trustees—Defendants Reinkemeyer, Shubik and Walden—who met quarterly. These trustees were required to review any "material deficiencies or weaknesses" in the Fund's internal controls for financial reporting.  This necessarily involved a review of the Board's valuation policies and treatment of restricted securities as liquid assets.  Yet these Defendants, despite undertaking these quarterly reviews, evidently found no deficiencies or weaknesses in these internal controls despite the ramping up of redemption requests coupled with an ever-increasing portfolio of dangerously illiquid assets.

83.     As one expert put it, "This fund was having hundreds of millions of dollars in redemptions last year—that definitely should have been a red flag for the board."  Yet the Audit Committee, Fair Valuation Committee, and the Board as a whole ignored that red flag until it was far too late to protect the Fund and its shareholders from near-total collapse.

84.     In addition to this direct involvement in the Fund's oversight, the Board also manages the Trust through the Trust's officers who are also the senior officers of Third Avenue Management.  Thus, the Trust's day-to-day management is controlled by the same persons who serve both as agents of the Board and the Investment Advisor.  The same people who participated in the day-to-day management and decisions comprising the breach of fiduciary duty

to the Fund, particularly Defendants Whitman and Barse, acted in both a capacity as an officer of the Trust and the Investment Advisor.

85.    The Trustees also met on June 4-5, 2014, as they do annually, to consider the renewal of the Investment Advisory Agreement with Third Avenue Management.   They reviewed materials related to the Fund's performance, and noted the "declining assets" in the Fund, yet approved the renewal—again ignoring the increasing illiquidity of the Fund and rash of redemptions that had occurred on Third Avenue Management's watch.

86.    In sum, the Trustee Defendants ignored a specific series of red flags regarding the Fund's increasing composition of illiquid assets in contravention of the SEC's and the Fund's own guidance, and ignored the dangers posed by the growing number of redemption requests to the Fund and the burden those requests were imposing, yet they took no protective action whatsoever.   Instead, the Trustees ignored the evidence and allowed Third Avenue Management to continue on its disastrous path.   This unfortunate inaction by the Trustees was not a carefully considered exercise of "business judgment"—it was a flagrant breach of their fiduciary duties to the Fund that resulted in a waste of corporate assets.   The Fund and its investors have suffered and will suffer substantial losses of more than $500 million as a result of these breaches.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

87.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

88.    Plaintiff brings this action derivatively for the benefit of the Fund to redress injuries suffered and injuries that continue to be suffered as a direct and proximate result of the misconduct alleged herein.   The Trust is named as a nominal defendant solely in a derivative capacity.

89.     Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing and prosecuting their rights.

90.     Plaintiff Engel has made a substantial investment in the Fund.  He owned his shares continuously throughout the period in which Defendants' wrongful acts occurred, and he continues to own his shares, thus giving him standing to pursue this action.

91.     This action is not being used by Plaintiff to gain any personal advantage, nor does Plaintiff maintain any personal agenda other than seeking to remedy the wrong that has been done.  To this end, Plaintiff has taken steps to file this action and has retained counsel experienced in derivative litigation and corporate governance actions.

92.     Plaintiff did not make a demand on the Trust to take remedial action on behalf of the Fund against the Defendants because such a demand would have been a futile, wasteful, and useless act.  The Trustees themselves participated in, approved, and/or permitted the wrongs alleged herein and concealed and disguised those wrongs—that is, the Trustees are the individual Defendants in this action who were responsible for managing, monitoring and planning for the Fund's liquidity under SEC rules and regulations and disclosures in the Fund's registration statements and prospectuses and who failed utterly to do so.  As discussed above, it was their acts and grossly negligent management decisions that constitute the breaches of fiduciary duty that harmed shareholders.

93.     In particular, the Trustees ignored a series of red flags regarding the increasing illiquidity of the Fund as well as the growing number of redemption requests the Fund was experiencing.  The Trustees were responsible for approving the Fund's liquidity levels; they were specifically charged with ensuring adherence to the 15% illiquidity limit.  Yet the Trustees sanctioned the continued acquisition of 144A securities and bank loans, the liquidity of which

was opaque at best.  The Trustees allowed a flouting of the 15% limit on at least two occasions—for the last two quarters of 2015—and likely on several occasions before that, inasmuch as a substantial number of securities owned by the Fund were not publicly traded, and therefore their relative liquidity could be determined and approved, in part, by the Trustees themselves in a process completely devoid of transparency or verifiability.

94.    And while this red flag—the growing illiquid composition of the Fund's assets—was ignored by the Trustees, two other red flags were ignored as well:  the growing illiquidity of the overall distressed-debt market, and the growing number of redemption requests being made on the Fund.  This combination proved to be a lethal cocktail for the Fund, one that the Trustees could have acted to prevent at any time, yet they consciously or recklessly chose not to do so.

95.    In addition, at least some of the Trustees have personal relationships with Defendant Whitman that call into question their ability to serve in an objectively independent capacity.  Defendant Shubik has been a friend of Whitman's since graduate school, regularly plays poker with him, and co-authored a book with him in 2005.  Defendant Walden also helped Defendant Whitman publish a book, this one in 2000.   (That is two-thirds of the Audit Committee right there.)  Other Trustees arguably lack the necessary expertise to serve in such a capacity; Defendant Franks' background, after all, is that of a journalist, with little-to-no relevant experience in the field of financial services.  While these issues on their own might not raise a concern, considered in light of the Trustees' repeated ignoring of red flags to the detriment of the Fund and its shareholders, they do give further credence to the likelihood that the Trustees were unable to function as a genuinely independent monitor of the Fund and Third Avenue Management.

96.     It would therefore be futile to make a demand on the Trustees to sue themselves. It was the Trustees own breaches of fiduciary duties and their gross negligence in failing to properly monitor risk which led to the harm.

97.     The Trustees are personally and directly conflicted by their actions such that they could not have been reasonably expected to respond to a demand in good faith.  They are not disinterested parties and lack sufficient independence to exercise business judgment in the best interests of the shareholders as alleged herein.

98.     For the foregoing reasons, demand is excused under applicable law.

## COUNT I

### BREACH OF FIDUCIARY DUTIES
### (Against All Defendants)

99.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

100.     Defendants, who were the Board of Trustees members and the Investor Advisor to the Fund, owed fiduciary duties of care and loyalty to the Fund in managing its affairs.  These duties are and were set forth in the Trust Agreement and the Trust's SEC filings.

101.      As alleged above, Defendants each breached their fiduciary duties to the Fund through willful misconduct and/or gross negligence.

102.     Plaintiff did not make demand on the Board because such demand would be futile.  The Board of Trustees is made up of the primary wrongdoers who engaged in these breaches of fiduciary duty.

103.     As a direct and proximate result of the breaches of fiduciary duty by Defendants, the Fund has sustained substantial harm and damage.

104.     Defendants are liable to the Fund as a result of the acts alleged herein.

105.     There is no adequate remedy at law.

## COUNT II

## BREACH OF CONTRACT
### (Against Defendant Third Avenue Management)

106.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

107.     Defendant Third Avenue Management had an Advisory Agreement with the Trust for the Fund which provided, under Article 2(b) that:

> In the performance of its duties under this Agreement, the Adviser shall at all times use all reasonable efforts to conform to, and act in accordance with, any requirements imposed by (i) the provisions of the Investment Company Act of 1940, as amended (the "Act"), and of any rules or regulations in force thereunder; (ii) any other applicable provisions of law; (iii) the provisions of the Trust Instrument and By-Laws of the Trust, as such documents are amended from time to time; (iv) the investment objective, policies and restrictions applicable to the Fund as set forth in the Fund's Prospectus (including its Statement of Additional Information) and (v) any policies and determinations of the Board of Trustees of the Trust.

108.     By reason of the willful and/or grossly negligent misconduct alleged herein, defendant Third Avenue Management breached these contractual duties owed to the Fund.

109.     These breaches caused proximate harm to the Fund.

110.     There is no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment on behalf of the Fund against the Defendants, jointly and severally, as set forth herein, as follows:

(i)       Declaring that this action is a proper derivative action;

(ii)      Ordering each of the Defendants to pay restitution and/or compensatory damages in favor of the Fund, plus prejudgment interest;

(iii)    Ordering that Third Avenue Management return all management fees, broker/dealer fees and other fees paid by the Fund during the period that it breached its fiduciary duties;

(iv)    Awarding Plaintiff his costs and disbursements and reasonable allowances for fees of Plaintiff's counsel and experts and reimbursement of expenses; and

(v)    Granting Plaintiff and the Fund such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial for any and all Counts for which a trial by jury is permitted by law.

**ZAMANSKY LLC**

By: /s/ Samuel E. Bonderoff
    Samuel E. Bonderoff

Jacob H. Zamansky
Edward H. Glenn Jr.
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177
*samuel@zamansky.com*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILLIAM ENGEL, | No. 1:16-cv-01118-PKC |
| Plaintiff, | |
| vs. | **AMENDED DERIVATIVE COMPLAINT** |
| | **DEMAND FOR JURY TRIAL** |
| THIRD AVENUE MANAGEMENT COMPANY LLC, MARTIN J. WHITMAN, DAVID M. BARSE, WILLIAM E. CHAPMAN, II, LUCINDA FRANKS, EDWARD J. KAIER, ERIC P. RAKOWSKI, MARTIN SHUBIK, CHARLES C. WALDEN, and PATRICK REINKEMEYER, | |
| Defendants, | |
| THIRD AVENUE TRUST, a Delaware Business Trust, | |
| Nominal Defendant. | |

## CERTIFICATE OF SERVICE

I, hereby certify in accordance with this Court's Individual Practices that on March 8, 2016, plaintiffs' counsel served the **AMENDED DERIVATIVE COMPLAINT** on all counsel of record by filing with the Court's ECF system.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED:  March 8, 2016
       New York, New York

By: /s/ *Samuel E. Bonderoff*
Samuel E. Bonderoff (SB-1591)

**ZAMANSKY LLC**
50 Broadway, 32nd Floor
New York, New York 10004
Telephone: (212) 743-1414
Facsimile:  (212) 742-1177
E-mail: samuel@zamansky.com