**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DANIEL W. KRASNER, individually, on behalf of all others similarly situated and derivatively on behalf of THIRD AVENUE TRUST,<br><br>           Plaintiff,<br><br>    v.<br><br>THIRD AVENUE MANAGEMENT, LLC, MARTIN J. WHITMAN, DAVID M. BARSE, VINCENT J. DUGAN, W. JAMES HALL III, MICHAEL BUONO, WILLIAM E. CHAPMAN, II, LUCINDA FRANKS, EDWARD J. KAIER, ERIC RAKOWSKI, PATRICK REINKEMEYER, MARTIN SHUBIK, CHARLES C. WALDEN,<br><br>           Defendants,<br><br>and<br><br>THIRD AVENUE TRUST,<br><br>           Nominal Defendant. | No. 16-cv-01118 (PKC)<br><br>ECF Case |

## [PROPOSED] COMPLAINT IN INTERVENTION

Plaintiff, by and through his attorneys, alleges upon knowledge as to himself and upon information and belief as to all other matters as follows:

## INTRODUCTION

1.    Defendants breached their fiduciary duties, aided and abetted the breach of fiduciary duties or violated their contractual obligations by failing to properly manage or oversee the management of the Third Avenue Focused Credit Fund ("Third Avenue" or the "Fund"). Instead, the Fund was imprudently overloaded with illiquid assets, which were not properly valued in setting Third Avenue's net asset value ("NAV").  On December 9, 2015, owing to the

Fund's inability to sell its investments at prices comparable to that at which they had been previously valued, the Fund suspended redemptions of its shares and instead adopted a plan of liquidation (the "Liquidation").

2.       However, Defendants' prior overvaluation of its investments caused Third Avenue to pay inflated price for investor redemptions prior to the Liquidation date damaging the Fund as well as Plaintiff and other remaining Third Avenue shareholders.  In addition, the need to liquidate its assets will cause the Fund to receive prices below that which it could have otherwise obtained further damaging Plaintiff and other shareholders of the Fund.  Finally, Plaintiff and the other shareholders of the Fund are being deprived of their ability to redeem their shares in Third Avenue for an indeterminate amount of time which is contrary to Third Avenue's mandate to function as an open-ended mutual fund.

## JURISDICTION AND VENUE

3.       Defendant Third Avenue Management, LLC asserts that substantial questions of federal law under 15 U.S.C. §80a-1 *et seq*. are raised in the action entitled *Engel v. Third Avenue Management Company LLC, et al.*, No. 1:16-cv-01118-PKC (S.D.N.Y.) (the "*Engel* Action"). Accordingly, among other reasons, this Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367, as Plaintiff seeks to intervene in the *Engel* Action.

4.       Venue is proper in this District pursuant to 28 U.S.C. §1391, as Third Avenue Management has its principle place of business within this District and a substantial part of the events giving rise to the claims asserted herein occurred within this District.

## PARTIES

**Plaintiff**

5.      Plaintiff is a current shareholder of the Fund who first purchased the Fund's

shares on September 15, 2009 and has continuously held shares of the Fund since that time.

**Nominal Defendant**

6.      (a)      Nominal Defendant Third Avenue Trust is a statutory trust organized

under Delaware law pursuant to a Trust Instrument dated October 31, 1996 (the "Trust

Instrument").  The Trust's principal executive offices are located at 622 Third Avenue, New

York, New York 10017.  The Trust is an open-ended investment company consisting of five

separate investment series, including the Fund, which commenced operations on or about August

31, 2009.

         (b)      The Fund is managed by a Board of Trustees (the "Board") which

maintains standing committees, including the Valuation Committee and the Fair Value

Committee, charged with the responsibility of establishing valuation policies, providing direction

to the investment adviser regarding the principles of valuing certain securities or types of

securities, and reviewing valuations determined by the investment adviser.

**The Trustee Defendants**

7.      Defendant Charles C. Walden ("Walden") has served as a member of the Board

since July 1999 and as the Board's "Lead Independent Trustee" since 2007.   Walden is a

member of the Board's Fair Value Committee.

8.      Defendant Martin J. Whitman ("Whitman") is the Chairman and founder of Third

Avenue Management, a Portfolio Manager, managed the flagship Third Avenue Value Fund

between 1990 and March 2012, and served as Third Avenue's Chief Investment Officer ("CIO")

from its founding through January 2010.  Whitman has served as the Chairman of the Trust since

July 1999 and has served as a member of the Board of Trustees (the "Board") since November

1990.  The Trust's Statements of Additional Information provided to investors acknowledge that

Whitman is an "Interested Trustee."  Whitman is also a major shareholder of Third Avenue

Management.

9.      Defendant William E. Chapman, II ("Chapman") has served as a member of the

Board since August 2002.  Chapman is a member of the Board's Fair Value Committee.

10.     Defendant Lucinda Franks ("Franks") has served as a member of the Board since

July 1999.   Franks is a member of the Board's Fair Value Committee.

11.     Defendant Edward J. Kaier ("Kaier") has served as a member of the Board since

August 2002.   Kaier is a member of the Board's Fair Value Committee.

12.     Defendant Eric Rakowski ("Rakowski") has served as a member of the Board

since August 2002.   Rakowski is a member of the Board's Fair Value Committee.

13.     Defendant Patrick Reinkemeyer ("Reinkemeyer") has served as a member of the

Board since January 2015.  Reinkemeyer is a member of the Board's Fair Value Committee.

14.     Defendant Martin Shubik ("Shubik") has served as a member of the Board since

July 1999.  Shubik is a member of the Board's Fair Value Committee.

15.     Defendants Walden, Whitman, Barse, Chapman, Franks, Kaier, Rakowski

Reinkemeyer, and Shubik are at times collectively referred to herein as the "Trustees" or the

"Trustee Defendants."

**The Third Avenue Management Defendants**

16.     (a)     Defendant Third Avenue Management LLC ("Third Avenue

Management" or the "Adviser") is a Delaware limited liability company with its principal

executive office located at 622 Third Avenue, New York, New York 10017.  Third Avenue

Management has served as the Fund's investment adviser since the Fund was first offered in

2009.  Pursuant to the Investment Advisory Agreements entered into with the Fund, Third

Avenue Management was responsible for supervising and assisting in the management of the

Fund, providing investment research and research evaluation, and arranging for the execution of

the Fund's purchase and sale of securities and other assets.

               (b)     Third Avenue Management, through its parent company Third Avenue

Holdings LLC, is a majority-owned subsidiary of Affiliated Management Group, Inc. ("AMG").

The remaining shareholders of Third Avenue Management are senior members of its

management.

               (c)     The Fund paid Third Avenue Management a monthly fee equal to an

annual rate of 0.75% based upon the average daily assets in the Fund.  Third Avenue

Management had an agreement to defer receipt of any advisory fees and/or reimburse the Fund's

expenses in order to limit the net annual operating expense of the Fund to no more than 0.95% of

assets in the Institutional Class and 1.20% of assets in the Investor Class.   Third Avenue

Management received the following payments for advisory fees from the Fund: $9,101,101 in

2013; $21,083,384 in 2014; and $17,095,571 in 2015.

        17.     Defendant David M. Barse ("Barse") served as Third Avenue Management's

Chief Executive Officer ("CEO") between 1991 and his termination in December 2015.   Barse

also served as the President from July 1999, as CEO from September 2003 and as a Trustee of

the Trust from September 2001 until his termination in December 2015.  Barse is a major

shareholder of Third Avenue Management.

18.     Defendant Vincent J. Dugan ("Dugan") has served as the Treasurer and Chief Financial Officer of the Trust since September 2004.  He is a member of the Board's Valuation Committee.  Dugan also serves as the Chief Operating Officer and CFO of Third Avenue Management since August 2004.  Dugan additionally serves as a member of the Adviser's Risk Committee, which is responsible for recommending certain position limitation guidelines for the Fund.

19.     Defendant W. James Hall III ("Hall") has served as General Counsel and Secretary of the Trust since June 2000 and is a member of the Board's Valuation Committee.

20.     Defendant Michael Buono ("Buono") has served as the Controller of the Trust and Third Avenue Management since May 2006 and is a member of the Board's Valuation Committee.

21.     Defendants Third Avenue Management, Barse, Dugan, Hall and Buono are at times collectively referred to herein as the "Third Avenue Defendants."  The Trustee Defendants along with the Third Avenue Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### The Fund

22.     The Fund was first offered to investors on or about August 31, 2009 and is registered under the Investment Company Act of 1940 (the "ICA"), 15 U.S.C. §80a-1, *et seq.*, as an open-ended mutual fund.  Open-ended mutual funds issue shares that are bought and sold at their net asset value ("NAV"), based upon the value of the fund's underlying securities and generally calculated at the end of each trading day.  Open-ended funds are required to allow investors to redeem the value of their shares upon demand.

23.     The Fund was one of five series of funds operated under the umbrella of the Trust, known collectively as the Third Avenue Funds.  The Trust is managed by the board of trustees (the "Board"), which hired Third Avenue Management to serve as the investment adviser for all of the Third Avenue Funds, including the Fund.

24.     The Fund focused on investing in bonds and other types of credit instruments that are rated below investment grade by some or all of the independent rating agencies, including Moody's, Standard & Poor's and Fitch, a class of assets otherwise known as "junk bonds" or "high-yield" securities.

25.     The Fund's strategy was to buy distressed debt and other investments likely to rise as the economy rebounded.  These included very low-rated junk bonds, including many rated CCC+ and below.  According to Standard and Poor's credit rating definitions, bonds rated CCC are "currently vulnerable to nonpayment, and [ ] dependent upon favorable business, financial and economic conditions for the obligor to meet its financial commitment on the obligation." Further, "[i]n the event of adverse business, financial or economic conditions, the obligor is not likely to have the capacity to meet its financial commitment on the obligation."

26.     The Fund offered two share series with different investment minimums and fees: the Investor Class and Institutional Class.  The minimum initial investment for the Investor Class was $2,500 with net annual operating expenses capped by agreement with the Adviser at 1.20% of assets under managements.  The Institutional Class required a minimum investment of $100,000 with net annual operating expenses capped at 0.95%.  The Fund grew steadily through mid-2014 under Lead Portfolio Manager Thomas Lapointe, with net assets under management topping out over $3 billion by the summer of 2014.

**The Market Experiences Liquidity and Valuation Challenges**

27.     While fixed income markets in 2013 and most of 2014 were robust, an increase in

demand for these assets without a concomitant increase in trading volumes was causing liquidity

in those markets to actually dry up.  A paper titled "The Liquidity Challenge: Exploring and

Exploiting (Il)liquidity" published by the *Blackrock Investment Institute* in June 2014 warned:

> ***Mutual funds: These liquid vehicles are holding an increasing amount of credit instruments.*** The value of corporate bonds held by U.S. mutual funds has more than doubled since 2007, reaching roughly $1.7 trillion, Investment Company Institute (ICI) data show. . . . This amounts to 17.6% of outstanding U.S. corporate debt, compared with 12.8% in 2007.
>
> ***Liquidity has not kept pace.*** Total outstanding corporate debt more than doubled in the decade ending 2013, whereas trading volumes are unchanged. Is this a problem? Corporate bonds are spread over many funds, and redemptions typically are a slow burn. ***That said, a sudden wave of reallocations has the potential to cause hiccups***—although long-term institutional buyers may use it as a buying opportunity. [Emphasis added.]

28.     Other influential commentators warned of an impending liquidity crunch as the

U.S. government's quantitative easing monetary policy was coming to an end.  On August 11,

2014, *Financial Times* published an article by Alberto Gallo titled "Unwary Yield Hunters Risk

Liquidity Trap – Sell Early to Avoid Rush for High-Yield Exit as Fed QE Ends" stating:

> With the end of the US Federal Reserve's low-for-long policy in sight, investors are set for a rough ride…. Yields are near record lows and liquidity in secondary markets is declining, making it harder to exit swiftly. Reducing exposure earlier could be a wise decision…. Indeed, US high-yield mutual funds and ETFs registered a record $7.1bn of outflows in the week to August 6.
>
> *       *       *
>
> Regulators have already raised red flags. The International Monetary Fund highlighted weaknesses in high-yield bonds and leveraged loans in its latest assessment of the US economy, warning of "a tail risk where there was a precipitous attempt by investors to exit certain markets – perhaps exacerbated by outflows

from ETFs and mutual funds as well as near-term market illiquidity." …[M]ost important, ***the plumbing of credit markets has changed***. …Dealers have less ability to warehouse risk and compensate for market volatility: ***an index by RBS estimates trading liquidity has dropped 70 per cent since 2007.*** [Emphasis added.]

29.     On November 24, 2014, *Reuters* published an article by Jessica Toonkel titled "When All of a Sudden The Most Liquid Market Out There Isn't Liquid, Its Worrisome" stating that "US fund firms are taking extra measures to make sure they don't get stuck holding hard-to-sell bonds in the event that fixed income markets see a massive race to the exits when interest rates start to rise." Specifically, several well-known asset managers were "testing their funds against various market scenarios, building cushions of cash, shorter-duration bonds, and other liquid securities, ***and regularly discussing risks with their boards.***" [Emphasis added]. A number of firms had "increased their allocations to cash to provide their portfolios with a buffer in the case of a liquidity crunch." Further, "concerns about bond liquidity [had] made it up to the fund board level." The article noted that at one fund, at the request of board members and its parent company, the head of investment risk management held a session on bond market liquidity for the board of trustees, detailing new monitoring procedures they had implemented to gauge liquidity.

30.     Other high-yield mutual fund managers were taking notice. In May 2015, Pacific Investment Management Company LLC ("PIMCO"), a stalwart of fixed income investing, published an article by Jelle Brons titled; "Security Selection and Liquidity Management Are Key in the Steadily Growing Credit Market" stating, in relevant part:

> *In the wake of the financial crisis, broker-dealers are less inclined to warehouse risk and move corporate bonds among investors, a trend that could affect liquidity in certain areas of the market.*
>
> *            *            *

Risk management should be a consistent focus for credit investors, and as the market expands in both size and complexity while broker-dealers continue to limit inventories, *portfolio liquidity management (i.e., ensuring accounts have sufficient liquidity at all times) becomes a core component of risk management. As securities age in PIMCO's credit portfolios, we tend to rotate out of less liquid securities as opportunities arise and/or we conclude we are not being sufficiently compensated for liquidity risk.*

## The Liquidity Risks and Standards Are Ignored at the Fund

31.     Section 22(e) of the ICA, 15 U.S.C. 80a-22(e), requires open-ended mutual funds registered under the Act, such as the Fund, to pay investors within seven days of a redemption request.  Further, under Rule 22c-1, 17 CFR §270.22c-l, an open-ended fund generally must sell and redeem its shares at a price based on the fund's current NAV as next computed after the receipt of a redemption, purchase or sale order.  Rule 38a-1, 17 *CFR* 270.38a-1, also requires funds to adopt and implement policies and procedures designed to prevent a violation of the federal securities laws such as the above relevant provision of the ICA.

32.     The Securities and Exchange Commission ("SEC") has continually reiterated the importance of managing an open-ended mutual fund's liquidity in order to timely satisfy investors' redemptions.  Accordingly, SEC guidelines dictate that an open-ended mutual fund should hold no more than 15% of its underlying portfolio assets in illiquid securities.  *See* Revision of Guideline to Form N-1A, Investment Company Act Release No. 18612, 57 Fed. Reg. 9828 (Mar. 20, 1992).  The SEC defines an "illiquid" asset as "an asset which may not be sold or disposed of in the ordinary course of business within seven days at approximately the value at which the mutual fund has valued the investment on its books."  *Id.* at 9829 (citing Acquisition and Valuation of Portfolio Instruments by Registered Investment Companies, Investment Company Act Release No. 14983, 51 Fed. Reg. 9773 (Mar. 21, 1986)).

33.     In response to increased volatility in the fixed income markets in June 2013, on January 1, 2014, the SEC released a guidance update titled "Risk Management in Changing Fixed Income Market Conditions" encouraging fund advisers to take the follow steps to managing and communicating liquidity risks:

> *Assess and Stress Test Liquidity*
>
> …In light of potential market volatility, fund advisers may consider assessing fund liquidity needs during both normal and stressed environments, including assessing their sources of liquidity…
>
> *Conduct More General Stress-Tests/Scenario Analyses*
>
> Fund advisers may consider assessing the impact (beyond just liquidity) of various stress-tests and/or other scenarios on funds…
>
> *Risk Management Evaluation*
>
> Fund advisers may want to consider using the outcomes of any assessments, analyses, and conversations to evaluate what risk management strategies and actions are most appropriate… These may include decisions around portfolio composition, concentrations, diversification and liquidity, among other factors.
>
> *Communication with Fund Boards*
>
> Fund advisers may consider what information should be provided to fund directors so that they are informed of the risk exposures and liquidity position of the fund, and the fund's ability to manage through changing interest rate conditions and potentially increased fixed income market volatility.
>
> *Shareholder Communications*
>
> Funds should also assess the adequacy of their disclosures to shareholders in light of any additional risks due to recent events in the fixed income markets and the potential impact of tapering quantitative easing and/or rising interest rates, including the potential for periods of volatility and increased redemptions… [Footnotes omitted.]

34.     On December 11, 2014, SEC Chair May Jo White spoke at the New York Times DealBook Opportunities for Tomorrow Conference stating that liquidity management had been a key area of focus for the SEC and that "[a] fund that does not manage liquidity risk in its portfolio could have difficulty meeting redemptions if it came under stress, particularly an open-end investment company, which has to provide shareholders with redemption proceeds within seven days of any redemption request."  Ms. White additionally stated that SEC staff was reviewing updated liquidity standards.

35.     The SEC recently proposed such new regulations stressing the importance of adequate liquidity management for open-ended mutual funds.  Thus, the SEC proposal states that "meeting daily redemption obligations is *fundamental* for open-end funds, and funds must manage liquidity in order to meet these obligations" and proposes a regulation requiring open-ended funds to develop liquidity risk management programs.  Open-Ended Fund Liquidity Risk Management Programs, Investment Company Act Release No. 31835 at 17, SEC File Nos. S7-16-15; S7-08-15 (Sept. 22, 2015) [Emphasis added].

36.     A mutual fund's board of directors, or a similar governing body, is responsible for determining a security's liquidity based upon the trading market for that specific security.  *See* Resale of Restricted Securities; Changes to Method of Determining Holding Period of Restricted Securities Under Rules 144 and 145, Investment Company Act Release No. 17452, 55 Fed. Reg. 17933, 17940 (Apr. 30, 1990).

37.     The Board represented to investors and the Fund's shareholders that it was monitoring liquidity.  Thus, the Trust regularly included in its Statement of Additional Information ("SAI"), which was incorporated by reference into the Trust's Prospectuses, a disclosure providing that:

*Under normal circumstances, none of the Funds will purchase or otherwise acquire any investment if, as a result, more than 15% of its net assets (taken at current market value) would be invested in securities that are illiquid.*

\*     \*     \*

*Over the past several years, strong institutional markets have developed for various types of restricted securities, including repurchase agreements, some types of commercial paper, and some corporate bonds and notes (commonly known as "Rule 144A Securities").* Securities freely salable among qualified institutional investors under special rules adopted by the SEC, or otherwise determined to be liquid, may be treated as liquid *if they satisfy liquidity standards established by the Board of Trustees (the "Board")*. The continued liquidity of such securities may not be as well assured as that of publicly traded securities, and accordingly, *the Board will monitor their liquidity*. *The Board will review pertinent factors such as trading activity, reliability of price information and trading patterns of comparable securities in determining whether to treat any such security as liquid for purposes of the foregoing 15% test*. [Emphasis added.][1]

38.     The Board also had the responsibility of valuing or overseeing the valuation of the Fund's assets, which was a crucial part of its oversight duties.  According to the Trust's SAI, the Board had a Valuation Committee made up of the Trust's Chief Financial Officer, Controller, and General Counsel: defendants Vincent Dugan, James Hall and Michael Buono, respectively. The SAI further stated that the Board had a Fair Value Committee composed of all outside Trustees of the Trust: defendants Charles Walden, William Chapman, Lucinda Franks, Edward Kaier, Eric Rakowski, Patrick Reinkemeyer and Martin Shubik.  Finally, according to the SAI, "[t]hese Committees assist the Board in establishing valuation policies, in providing direction to the Adviser regarding the principles of valuing certain securities or types of securities, and in

---

[1]     This particular disclosure was included in the SAI dated March 1, 2015 (Revised march 2, 2015, March 20, 2015 and October 15, 2015).  Substantially similar disclosures were included in the Trust's other SAIs distributed to the Fund's investors.

reviewing valuations determined by the Adviser.  The Valuation Committee and a member of the Fair Value Committee meet or confer as needed between Board meetings."

39.     According to the Trust's March 1, 2015 Prospectus, the "valuation committee of designated independent Trustees [makes] a determination of fair value based on committee members' or Trustees' judgments of relevant information and an analysis of the asset class . . . Details of fair valuation methodologies and determinations for all fair valued positions are reviewed by the Trustees of the Trust on a quarterly basis."  According to SEC guidance, a fund's board may enlist the assistance of individuals who are not board members to assist with its valuation duties, but it may not fully delegate these responsibilities and must establish the fair value methodology and continuously review both the appropriateness of the methods used and the valuation findings resulting from such methods.  *See* Accounting for Investment Securities by Registered Investment Companies, Accounting Series Release No. 118, 35 Fed. Reg. 19986, 19988-89 (Dec. 23, 1970).

40.     The communications promulgated by the Trust also assured the Fund's investors that redemption requests would be timely honored, as they should be consistent with the ICA and SEC guidance, stating in the prospectuses filed by the Trust with respect to issuing shares of the Fund that:

> **General**
>
> You may redeem your shares on any day during which the NYSE is open for trading, either directly from a Fund or through certain broker-dealers or other financial intermediaries. Fund shares will be redeemed at the NAV next calculated after your order is received in good order by a Fund or its designees…
>
> *     *     *

**Payment of Redemption Proceeds**

*A Fund will usually make payment for redemptions of Fund shares within one business day, but not later than seven calendar days, after receipt of a redemption request.* [Emphasis added.]

41.     The Adviser had its own duties to shareholders and the Fund.  Article 2(b) of the Investment Advisory Agreements between Third Avenue Management and the Trust stated that the Adviser would abide by these standards in managing the Fund.  Specifically, the Investment Advisory Agreements provide that:

> In the performance of its duties under this Agreement, the Adviser shall at all times use all reasonable efforts to conform to, and act in accordance with, any requirements imposed by (i) the provisions of the Investment Company Act of 1940, as amended (the "Act"), and of any rules or regulations in force thereunder; (ii) any other applicable provisions of the law; (iii) the provisions of the Trust Instrument and By-Laws of the Trust…; (iv) the investment objective, policies and restrictions applicable to the Fund as set forth in the Fund's Prospectus (including its Statement of Additional Information) and (v) any policies and determinations of the Board of Trustees of the Trust.

42.     Contrary to its duties to adequately oversee the Fund and the Adviser, the Board reportedly allowed defendant Barse and his top lieutenants to run the Fund's operations as they saw fit.  *The Business Insider*, "Inside Third Avenue Management, where employees were terrified to bring bad news to the boss," by Tim McLaughlin, Ross Kerber and Svea Herbst-Bayliss, December 24, 2015.

**The Fund Fails to Maintain Adequate Liquidity
While the High-Yield Market Declines**

43.     Notwithstanding the mandate of the ICA, SEC guidance requiring the Fund to maintain adequate liquidity, the Trust's own representations that it would monitor liquidity, and the promises set forth in the Investment Advisory Agreements, the Board and the Adviser failed to ensure that the Fund maintained adequate liquidity.

44.    The relative illiquidity of the Fund was reflected by a Generally Accepted Accounting Principles ("GAAP") method used to determine the fair value of a fund's assets. Under Financial Accounting Standards Board Accounting Standards Codification Topics 820-10, Fair Value Measurements and Disclosures ("FASB ASC 820-10"), there are three levels for determining fair value, which use the following inputs:

- Level 1 – Quoted prices in active markets for identical assets or liabilities;

- Level 2 – Significant other observable inputs, such as quoted prices for similar assets using observable data such as interest rates and yield curves; and

- Level 3 – Significant unobservable inputs not derived from the market which may include inputs such as cash flow forecasts, default probabilities and loss severity analyses.

45.    Accordingly, Level 1 assets represent the most liquid as the value is dictated by active trading markets while Level 3 assets represented the least liquid as there are no observable market inputs to help determine their value.  By most mutual fund standards, only Level 1 assets are deemed to be liquid, or capable of being sold at a price at or near their valuation within a reasonable period of time.

46.    Rather than shifting to more liquid assets as investor net redemptions were mounting, the Fund held a large proportion of less liquid Level 2 and illiquid Level 3 securities investments as demonstrated in the chart below based upon the Fund's SEC filings:

| Date | Total Investments | Level 1 | % | Level 2 | % | Level 3 | % |
|---|---|---|---|---|---|---|---|
| 04/30/14 | $2,698,087,237 | $265,497,166 | 9.84 | $2,262,866,276 | 83.87 | $169,723,795 | 6.29 |
| 10/31/14 | $2,750,104,097 | $236,222,158 | 8.59 | $2,006,630,809 | 72.97 | $507,251,130 | 18.44 |
| 04/30/15 | $2,314,738,823 | $193,395,860 | 8.35 | $1,720,698,211 | 74.34 | $400,644,752 | 17.31 |
| 10/31/15 | $1,170,445,838 | $97,294,599 | 8.31 | $795,763,908 | 67.99 | $277,387,311 | 23.70 |

47.     The Thus, the Fund was allocated in manner actually **opposite the SEC's guidance**.  Rather than holding only 15% illiquid assets, the Fund was actually holding less than 10% in liquid (Level 1) assets and over 90% in less liquid or illiquid (Level 2 and 3) assets.

48.     Along these lines, the Fund had 76% of its portfolio exposed to very low-rated CCC+ securities and below, compared to a median level of 22% of such securities among similar junk bond funds, according to analysts at Citigroup.  *See The Business Insider*, "Inside Third Avenue Management, Where Employees Were Terrified to Bring Bad News to the Boss," by Tim McLaughlin, Ross Kerber and Svea Herbst-Bayliss, December 24, 2015.   The Fund also purchased large portions, ten percent or more, of smaller, less frequently-traded bond offerings, including for the bankrupt Energy Future Holdings Corp.  *See Bloomberg Business*, "Investors See Third Avenue Fueling More Bond Market Carnage," by John Gittelsohn, December 13, 2015.   The accumulation of such large stakes in these types of assets was especially reckless. As the Fund became "the largest holder of certain loans and securities that traded infrequently," when it then went to sell these assets, "savvy traders…quickly figured out that a large investor was under pressure to sell" and offered "lowball bids for some of its assets, which would have caused it to absorb big losses if it sold at those prices."   *See The Wall Street Journal*, "Third Avenue CEO Barse Departs," December 14, 2015.

49.     According to its October 31, 2015 Fourth Quarter Report, the Fund additionally held many other low-liquidity or illiquid types of investments such as private equities, units of closed-end funds, and term loans, including Debtor-in-Possession loans for bankrupt entities and loans to energy companies.

**The Fund Redeems Hundreds of Millions of Dollars of its**
**Shares at Inflated Prices and Then Blocks Further Redemptions**

50.     In 2015, the lowest rated high-yield securities performed far worse than the rest of the market.  The rout was fueled by falling commodities, including energy, prices, to which sector the high-yield segment of the market is heavily weighted.  The Fund had over $2.97 billion in net assets at the beginning of fiscal year 2015, but due to portfolio losses and redemptions, it was down to $2.46 billion by April 30, 2015, with net redemptions of over $186 million.  The Fund's net assets continued to fall in 2015 to $1.37 billion on October 31, 2015, with net redemptions for the entire fiscal year totaling over $938 million.  Thus, over $750 million in net redemptions occurred in the last half of fiscal 2015.

51.     Those shareholders cashing out benefitted from the Fund's failure to properly value its assets at the expense of its remaining shareholders.  The Fund's heavy holdings of illiquid assets make it extremely unlikely that prior redemptions were properly valued.  Thus, "Third Avenue's credit fund . . . more than any of its peers, skewed its portfolio toward high-risk, high-return turnaround situations in which the bonds traded so infrequently that determining a price for them was little more than guesswork."  *The New York Times*, "A New Focus on Liquidity After a Fund's Collapse," by Landon Thomas Jr., January 11, 2016.  The *Times* further reported that the SEC has previously prosecuted mutual funds for inflating the value of hard-to-sell securities, and that here, it might investigate "whether the portfolio managers at the [Fund] set prices too high for the most illiquid bonds. Mispricings of hard-to-trade (and hard-to-value) securities give investors a distorted view of the assets' worth — which makes the fund all the more vulnerable when investors remove their money *en masse*."

52.     Having failed to maintain adequate liquidity consistent with the mandates of an open-ended mutual fund, on December 9, 2015, Third Avenue Management notified Fund

investors that it was no longer accepting redemptions and planned to put the Fund into

liquidation (the "Liquidation Announcement").  Barse stated in a message to investors:

> We believe that, with time, [the Fund] would have been able to realize investment returns in the normal course.  Investor requests for redemption, however, in addition to the general reduction of liquidity in the fixed income markets, have made it impracticable for the Fund going forward to create sufficient cash to pay anticipated redemptions without resorting to sales at prices that would unfairly disadvantage the remaining shareholders.
>
> In line with its investment approach, the Fund has some investments in companies that have undergone restructurings in the last eighteen months, and while we believe that these investments are likely to generate positive returns for shareholders over time, if [the Fund] were forced to sell those investments immediately, it would only realize a portion of those investments' fair value given market conditions.

53.     As noted by *Morningstar* in an article entitled "Many Concerns About Third

Avenue," had the Fund "met further redemption requests, it likely would have decimated the

Fund's performance, leaving remaining shareholders with even deeper losses."

54.     On December 11, 2015, Barse presented a rescue plan to the Board which

involved selling the Fund's assets to private-equity firm Fortress Investment Group LLC

("Fortress").  The Board rejected the offer as apparently too low, highlighting the prior

overvaluing of the Fund's assets as redemptions were processed during 2015.  Believing that the

offer represented fair value for the Fund's assets, however, Barse vowed to push forward despite

the Board's disapproval.  The Board then terminated Barse.  AMG's Chairman, Sean Healey,

was personally involved in the discussions that lead to Barse's termination.

55.     Since the Liquidation Announcement, the Fund's NAV has significantly

underperformed its benchmarks with the Fund's NAV falling over 20% to present while other

high-yield funds such as the SPDR® Barclays High Yield Bond ETF and the iShares iBoxx $

High Yield Corporate Bond ETF have fallen only approximately 6.4% and 5% respectively. The Fund's stark departure from such benchmarks further demonstrates the inflated values at which the Fund's assets were previously set and at which redemptions were improperly paid.

56.     On December 16, 2015, Third Avenue notified Fund investors that it was working with the SEC to liquidate the Fund through the Focused Credit Fund rubric rather than a separate liquidation vehicle. The Fund stated that the initial shareholder distribution would include only 9% of the Fund's capital, demonstrating that the Fund could not quickly sell 91% of its remaining assets at reasonable or above fire-sale prices.

57.     On December 22, 2015, Morningstar announced that in the wake of the demise of the Fund, it was downgrading its assessment of Third Avenue Management, as adviser to all of the Third Avenue Funds, from Neutral to Negative. In discussing the Fund's downfall, Morningstar noted that:

> Perhaps the most fundamental failure came at the outset in the firm's decision to offer the Focused Credit strategy as an open-end mutual fund at all. The open-end format demands daily liquidity, yet this was no ordinary high-yield bond fund. Among other items, the fund invested in high-yield bonds, loans, common stocks, and even some private equities, many of which became increasingly illiquid. Its weighting in nonrated debt was the highest in the peer group, and its weighting in B rated or lower debt was second-highest. The underlying distressed bonds central to the strategy were particularly prone to illiquidity. ***Management, and the board that oversaw the fund, failed to reconcile this inconsistency, and that mismatch ultimately proved to be the fund's undoing.***
>
> However, once the decision to launch the fund had been made, ***management and the fund's board had a responsibility to monitor the fund's liquidity and make necessary adjustments to ensure the fund could meet redemption requests in an orderly way. They failed to do so—management in miscalculating the potential illiquidity of the fund's holdings and the board in not holding management's feet to the fire as a secondary check.*** [Emphasis added].

*See* Morningstar, "Many Concerns About Third Avenue," December 22, 2015.

## CLASS ACTION ALLEGATIONS

58.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of all current shareholders of the Fund who continue to hold Fund shares (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation or entity related to or affiliated with any of the defendants.

59.     The class is so numerous that joinder of all members is impractical.  At the time Fund redemptions were suspended, approximately $789 million worth of assets remained under management, representing thousands of shareholders.

60.     There are questions of law and fact common to the class that predominate over questions affecting only individual members, including but not limited to:

(a) whether Defendants improperly overvalued Fund shares when processing shareholder redemptions prior to the suspension of Fund redemptions;

(b) whether Defendants failed to maintain adequate liquidity in the Fund in contravention of applicable law, standards and guidance;

(c) whether Defendants breached their fiduciary duties or aided and abetted the breach of fiduciary duties to Fund shareholders by virtue of the aforementioned mismanagement, lack of oversight, recklessness and gross negligence; and

(d) the standard of conduct necessary to hold Defendants individually liable for their acts or omissions.

61.     Plaintiff's claims are typical of the claims of the class members, and by pursuing his own interest, Plaintiff will advance the interests of the absent class members.

62.     Plaintiff will fairly and adequately protect the interests of the class and has retained competent counsel experienced in litigation of this nature.  There are no conflicts of

interest between Plaintiff and the absent class members and Plaintiff will vigorously prosecute this action on behalf of the class.

63.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The prosecution of separate actions by individual members of the Class would create the risk of inconsistent adjudications with respect to individual members of the Class.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

64.     Plaintiff brings this action derivatively in the right and for the benefit of Trust, to redress injuries suffered and likely to be suffered by the Trust as a direct result of Defendants' violations of their fiduciary obligations.  The Trust is named solely as a nominal defendant.

65.     Plaintiff will adequately and fairly represent the interests of the Trust in enforcing and prosecuting its rights, and has retained counsel experienced in litigating these types of actions.

66.     The Trustees' conduct in failing to properly value the Fund's assets and causing Third Avenue to over-concentrate its investments in illiquid securities is not protected by the business judgment rule making any demand on the Board of the Trust futile.

67.     The Trust's Board is currently composed of eight members, including Defendants Whitman, Chapman, Franks, Kaier, Rakowski, Reinkemeyer, Shubik and Walden.  Plaintiff did not make a demand on the Board to institute this action because such demand would be futile and any effort to cause the Trustees to bring the action would have been unlikely to succeed because:

> a.   The Trustees are subject to a substantial likelihood of liability in connection with their failure to ensure the Fund maintained adequate liquidity to satisfy redemptions, that investments were properly valued, that redemptions were not paid at inflated values and the other

wrongdoing alleged herein.  Indeed, according to an article published by *The New York Times* by Landon Thomas Jr. on December 14, 2015 titled "Junk Bond Fund's Chief Departs After Blocking Withdrawals," William F. Galvin, the secretary of the commonwealth of Massachusetts has opened an investigation into the wrongdoing described herein and the SEC reportedly has staff members present at Third Avenue Management's offices monitoring the situation.

b.  The Trustees' conduct was not a proper exercise of business judgment as holding such a high proportion of the Fund's investment in illiquid, hard to value securities was contrary to the fundamental premise of an open-ended mutual which was to allow for easy investor redemptions and the Trustees failed adequately oversee the Adviser to ensure that the Fund was maintaining sufficient liquidity in order to meet investor redemptions.

c.  Pursuant to the Trust Instrument (§§10.1 and 10.2) and the ICA, the Trustees are not entitled to be exculpated or indemnified for willful misfeasance, bad faith, gross negligence or reckless disregard. Accordingly, the Trustees could not impartially consider a demand because of the substantial personal liability they face in connection with their wrongful acts alleged herein.

d.  Defendant Whitman as the founder, Chairman and portfolio manager at Third Avenue Management is considered by the Trust to be an Interested Trustee under the ICA and would not be able to consider a demand against the Third Avenue Defendants in an independent and disinterested manner as it would be contrary to his own economic and reputational interests in connection with Third Avenue Management.

e.  Defendant Chapman would not be able to impartially consider a demand against Third Avenue Management as it is a majority owned subsidiary of AMG.  Chapman sits on the board of a number of AMG-affiliated mutual funds including: The AMG Funds (since 1999); Harding, Loevner Funds, Inc. (since 2008); Aston Funds (since 2010); and Third Avenue Variable Trust (since 2002).  In 2014 alone, Chapman received over $500,000 in fees from his service on AMG affiliated funds and, therefore, would be unable to consider a demand against the interests of AMG affiliates such as Third Avenue Management in an independent and disinterested manner.  Chapman's principle occupation is serving as the President and Owner of Longboat Retirement Planning Solutions, a consulting firm, with estimated revenues of between $1 million to $2.5 million and 1 to 4 staff members. Accordingly, the compensation Chapman received from the AMG-affiliated funds was a material source of income.

f.  Defendant Franks is a former journalist and author who has served as a Trustee of the Trust and the Third Avenue Variable Trust respectively since 1999 and 1998.  Accordingly, Franks would be unable to consider a demand against the interests of the Third Avenue Defendants in an independent and disinterested fashion as her compensation from the trusts, which in 2014 alone totaled $85,000, represents a material source of income.  According to salary report provided to Glassdoor.com as of August 18, 2015, salaries for journalist at *The New York Times* ranged between $95,000-$115,000 per year.  In addition, Frank's husband, Robert M. Morgenthau, is a close friend of defendant Whitman.  Whitman has made substantial contributions to Morengthau's campaigns, including a $25,000 contribution in 2006.  Franks could not consider a demand against the Third Avenue Defendants in an unbiased manner by virtue of the close family friendship and loyalties developed by almost two decades of service.

g.  Defendant Kaier would not be able to consider a demand against Third Avenue Management as he also sits on the board of a number of AMG-affiliated mutual funds including: The AMG Funds (since 1999); Aston Funds (since 2010); and Third Avenue Variable Trust (since 2002).  In 2014 alone, Kaier received over $400,000 in fees from his service on AMG affiliated funds and, therefore, would be unable to consider a demand against the interests of AMG affiliates such as Third Avenue Management in an independent and disinterested manner.  Kaier's principal occupation is serving as a partner of the law firm Teeters Harvey Gilboy & Kaier LLP.  Average profits per partner for the Am Law 200 was approximately $700,000 in 2013, making the compensation Kaier received from the AMG affiliated funds a material source of income.

h.  Defendant Rakowski would not be able to consider a demand against Third Avenue Management as he also sits on the board of a number of AMG-affiliated mutual funds including: The AMG Funds (since 1999); Harding, Loevner Funds, Inc. (since 2008); Aston Funds (since 2010); and Third Avenue Variable Trust (since 2002).  In 2014 alone, Rakowski received over $450,000 in fees from his service on AMG-affiliated funds and, therefore, would be unable to consider a demand against the interests of AMG affiliates such as Third Avenue Management in an independent and disinterested manner.  Rakowski's principal occupation is serving as a Professor at the University of California Berkeley School of Law for which he earned $274,366 in 2014 making the compensation received from the AMG affiliated funds a material source of income.

i.  Defendant Shubik is a Professor at Yale University who has served as
a Trustee of the Trust and the Third Avenue Variable Trust
respectively since 1999 and 1990.   Shubik co-authored a book with
Defendant Whitman in 2005 called "The Aggressive Conservative
Investor."   Accordingly, Shubik would be unable to consider a demand
against the interests of the Third Avenue Defendants in an independent
and disinterested fashion as his compensation from the trusts, which in
2014 alone totaled $85,000, representing a material source of income
as the average Yale professor earns an annual salary of approximately
$260,000.  Moreover, Shubik could not consider a demand against the
Third Avenue Defendants in an unbiased manner by virtue of the
loyalties developed by more than two decades of service and the close
working relationships developed over that time.

j.  Defendant Walden has served as a Trustee of the Trust and the Third
Avenue Variable Trust respectively since 1999 and 1996.   Walden
assisted Defendant Whitman with a book published in 2000 called
"Value Investing: A Balanced Approach."   Accordingly, Walden could
not consider a demand against the Third Avenue Defendants in an
unbiased manner by virtue of the loyalties developed by two decades
of service and the close working relationships developed over that
time.

k.  Pursuant to the Trust Instrument (§§3.3 and 3.4) the Trustees have the
power to remove trustees and to fill and vacancies on the Board.  Here,
over two-thirds of the Trustees have common interests with AMG and
the Third Avenue Management Defendants and, therefore, no one
Trustee would risk their position and material compensation by
agreeing to a demand contrary to those interests for fear of being
removed as a trustee.  Indeed, AMG's control over at least the two-
thirds of the Board is evidenced by the involvement of AMG
Chairman, Sean Healey, in connection with the termination of Barse.

## COUNT I
## Breach of Fiduciary Duty Directly Against All Defendants on Behalf of the Class

68.   Plaintiff incorporates by reference and realleges each and every allegation set
forth above as if set forth fully herein.  Plaintiff asserts this claim directly against all Defendants
on behalf of himself and the Class.

69.     By virtue of their positions as Trustees and/or Officers of the Trust and/or Adviser to the Fund, Defendants owed fiduciary duties of loyalty and care to the shareholders of the Fund.

70.     Through their gross negligence and/or reckless disregard of these duties, by, *inter alia*, failing to maintain adequate liquidity to meet all Fund redemptions and improperly valuing the NAV of Fund shares in making prior redemptions, Defendants breached these duties. Defendants caused the Fund to pay redemptions at inflated values, thereby shortchanging Plaintiff and other similarly situated investors who remained in the Fund by directly decreasing the value of their investments in the Fund.

71.     Alternatively, Defendants aided and abetted these breaches of fiduciary duties to Plaintiff and the Class by knowingly inducing, participating and/or rendering substantial assistance in the breaches.

72.     As a direct and proximate result of these breaches and this conduct, Plaintiff and the Class have been damaged.

## COUNT II
### Breach of Fiduciary Duty Derivatively Against All Defendants

73.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.  Plaintiff asserts this claim derivatively against all Defendants on behalf of the Fund and its investors.

74.     Defendants owed fiduciary duties of loyalty and care to the Fund as Trustees and/or Officers of the Trust and/or Adviser to the Fund.

75.     By virtue of their gross negligence and/or recklessness disregard of these duties, through, *inter alia*, ignoring market warnings and SEC guidance, rules and regulations, failing to

adequately monitor and maintain the Fund's liquidity, and deepening the Fund's exposure to highly risky illiquid assets, Defendants breached these duties.

76.    Alternatively, Defendants aided and abetted these breaches of fiduciary duties to the Trust and the Fund by knowingly inducing, participating and/or rendering substantial assistance in the breaches.

77.    As a direct and proximate result of these breaches, the Fund and its shareholders, including Plaintiff, have been damaged.

**COUNT III**
**Breach of Contract Derivatively Against Third Avenue Management**

78.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.  Plaintiff asserts this claim derivatively against Third Avenue Management on behalf of the Fund and its investors.

79.    The Investment Advisory Agreements between Third Avenue Management and the Trust constituted valid and enforceable contracts.

80.    The Trust fully performed its obligations under these agreements.

81.    Third Avenue Management breached these agreements, specifically, Article 2(b) therein, by, *inter alia*, failing to act in accordance with ICA, its accompanying rules and regulations, and the policies concerning liquidity and monitoring set forth in the Prospectuses and accompanying Statements of Additional Information.

82.    As a direct and proximate result of these breaches, the Fund and its shareholders, including Plaintiff, have been harmed.

**BASIS FOR INFORMATION AND BELIEF**

83.    Plaintiff's information and belief is based upon an investigation conducted by  his attorneys, including, but not limited to, a review of SEC filings and reports made by the Trust

and the Fund as well as news reports, press releases, securities analyst reports and other publicly available information regarding the Trust and the Fund.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Awarding damages with respect to Defendants' breach of their fiduciary duties or aiding and abetting the breach of fiduciary duties in an amount to be determined to trial;

B.      Awarding damages against Third Avenue Management with respect to its breach of contract;

C.      Certifying the claims brought in Count I as a class action with Plaintiff as the class representative and his counsel as Class Counsel;

D.      Awarding Plaintiff his costs and disbursements and reasonable allowances for attorney's fees and expenses; and

E.      Granting Plaintiff, the Class and the Trust such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial for any and all Counts for which a jury trial is permitted by law.

Dated: March 31, 2016

**ABRAHAM, FRUCHTER & TWERSKY, LLP**

<u>        /s/ Jeffrey S. Abraham                    </u>
Jeffrey S. Abraham
Cassandra L. Porsch
Philip T. Taylor
One Penn Plaza, Suite 2805
New York, NY 10119
Tel.  (212) 279-5050
Fax  (212) 279-3655

***Counsel for Proposed Intervenor***
***Daniel W. Krasner***