# EXHIBIT A

1

      IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

AVI WAGNER, individually, on behalf    :
of all others similarly situated and   :
derivatively on behalf of THIRD        :
AVENUE TRUST,                          :
                                       :
            Plaintiff,                 :
                                       :  Civil Action
            v.                         :  No. 12184-VCL
                                       :
THIRD AVENUE MANAGEMENT LLC, MARTIN     :
J. WHITMAN, DAVID M. BARSE, WILLIAM     :
E. CHAPMAN II, LUCINDA FRANKS,          :
EDWARD J. KAIER, ERIC RAKOWSKI,         :
PATRICK REINKEMEYER, MARTIN SHUBIK,     :
CHARLES C. WALDEN, VINCENT J. DUGAN,    :
W. JAMES HALL, JOSEPH J. REARDON,       :
and MICHAEL BUONO,                      :
                                       :
            Defendants,                 :
                                       :
            and                        :
                                       :
THIRD AVENUE TRUST, a Delaware         :
Business Trust,                        :
                                       :
            Nominal Defendant.         :
                     - - -
                              Chambers
                              New Castle County Courthouse
                              500 North King Street
                              Wilmington, Delaware
                              Friday, May 20, 2016
                              2:00 p.m.


                     - - -
BEFORE:  HON. J. TRAVIS LASTER, Vice Chancellor
                     - - -


                  TELECONFERENCE
RE WHETHER BRIEFING OF DEFENDANTS' MOTIONS TO DISMISS
     SHOULD BE BIFURCATED AND THE COURT'S RULING
------------------------------------------------------
              CHANCERY COURT REPORTERS
               500 North King Street
             Wilmington, Delaware 19801
                  (302) 255-0521

2

```
 1   APPEARANCES: (via telephone)

 2
                 JOEL FRIEDLANDER, ESQ.
 3               JEFFREY M. GORRIS, ESQ.
                 Friedlander & Gorris, P.A.
 4                    -and-
                 LAWRENCE P. EAGEL, ESQ.
 5               of the New York Bar
                 Bragar Eagel & Squire, P.C.
 6                 for Plaintiff

 7
                 KEVIN R. SHANNON, ESQ.
 8               BERTON W. ASHMAN, ESQ.
                 JACLYN C. LEVY, ESQ.
 9               Potter, Anderson & Corroon LLP
                      -and-
10               JONATHAN M. WAGNER, ESQ.
                 of the New York Bar
11               Kramer, Levin, Nr
                   for Defendants Third Avenue Management
12                 LLC, Michael Buono, Vincent J. Dugan,
                   W. James Hall, and Joseph J. Reardon

13
14               KEVIN M. COEN, ESQ.
                 Morris, Nichols, Arsht & Tunnell LLP
15                    -and-
                 RACHEL PENSKI FISSELL, ESQ.
16               of the New York Bar
                 Milbank Tweed Hadley & McCloy LLP
17                 for Defendant David M. Barse

18
                 LISA A. SCHMIDT, ESQ.
19               RYAN P. DURKIN, ESQ.
                 Richards, Layton & Finger, P.A.
20                    -and-
                 JONATHAN E. RICHMAN, ESQ.
21               of the New York Bar
                 Proskauer Rose LLP
22                 for Defendant Martin J. Whitman

23   Continued

24
```

CHANCERY COURT REPORTERS

3

1    APPEARANCES CONTINUED:

2

          A. THOMPSON BAYLISS, ESQ.
3         Abrams & Bayliss LLP
                -and-
4         ROBERT A. SKINNER, ESQ.
          of the Massachusetts Bar
5         Ropes & Gray LLP
            for Defendants William E. Chapman II,
6           Lucinda Franks, Edward J. Kaier, Eric
            Rakowski, Patrick Reinkemeyer, Martin
7           Shubik, Charles C. Walden, and Nominal
            Defendant Third Avenue Trust

8                           – – –

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1             THE COURT:  Good afternoon, everyone

2   this is Travis Laster speaking.  Who is here for the

3   defendants?

4             MR. SHANNON:  Good afternoon,

5   Your Honor.  Kevin Shannon, Potter Anderson.  With me,

6   Bert Ashman and Jackie Levy.  And my co-counsel --

7             THE OPERATOR:  Joining the meeting...

8             MR. SHANNON:  -- of Kramer Levin for

9   Third Avenue Management LLC, Michael Buono, Vincent

10  Dugan, James Hall, and Joseph Reardon.

11            THE COURT:  Great.

12            MR. BAYLISS:  And, Your Honor, it's

13  Tom Bayliss on behalf of the trust and the independent

14  trustees.  With me on the line is Rob Skinner of Ropes

15  & Gray who has been admitted pro hac vice.  To the

16  extent the Court has questions for the trust or the --

17            THE OPERATOR:  Joining the meeting...

18            MR. BAYLISS:  -- Mr. Skinner plans to

19  address them.

20            MR. SKINNER:  Yes, I'm on.

21            THE COURT:  Great.  Thank you.

22            MS. SCHMIDT:  Good afternoon, Your

23  Honor.  Lisa Schmidt from Richards, Layton & Finger.

24  I'm here with Ryan Durkin in my office.  Also on the

1   line is Jonathan Richman from Proskauer, and we are

2   counsel to Mr. Whitman.

3                    THE COURT:  Okay.

4                    MR. COEN:  And good afternoon,

5   Your Honor.  This is Kevin Coen at Morris Nichols on

6   the line on behalf of defendant David Barse.  And with

7   me on the line is my co-counsel from Milbank Tweed,

8   Rachel Fissell.

9                    THE COURT:  Is that everyone from the

10  defense side?

11                   All right.  Hearing no one else, who

12  is on for the plaintiff?

13                   MR. FRIEDLANDER:  Good afternoon, Your

14  Honor.  Joel Friedlander and Jeffrey Gorris from

15  Friedlander & Gorris, and also Larry Eagel from Bragar

16  Eagel & Squire.  Perhaps he has some colleagues with

17  him.  I'm not sure.

18                   THE COURT:  That's good enough.

19                   Mr. Shannon, do you want to take it

20  away?

21                   MR. SHANNON:  Your Honor, with your

22  permission, Mr. Wagner will speak on behalf of the

23  management defendants.

24                   THE COURT:  Okay.

6

1              MR. SHANNON:  Thank you.

2              MR. WAGNER:  Your Honor, thank you.

3      Maybe I should -- since we have eight sets of lawyers

4      on the call, maybe I should just clear up some

5      potential conclusion at the outset.  My name is

6      Mr. Wagner, obviously not related to the plaintiff,

7      Avi Wagner, who is actually a class-action plaintiffs'

8      lawyer in California.  I think so that no one gets

9      confused, we should just refer to him as "the

10     plaintiff."

11              So I don't want to address the merits

12     of the forum issue.  What I want to focus on is why

13     briefing should be bifurcated.  That's what I

14     understand the purpose of this call is.

15              I start with the premise and I think

16     we all start with the premise that issues with respect

17     to the Focused Credit Fund and Third Avenue should be

18     resolved in an orderly fashion in a way that maximizes

19     judicial efficiency and minimizes the prospect of

20     inconsistent judgments.

21              And in that respect, the plaintiff,

22     who is opposing bifurcating briefing, has a very big

23     hurdle.  The Southern District judge who is presiding

24     over this case, Judge Castel, has before him all the

1    Focused Credit Fund and all the Third Avenue

2    Management-related litigation.  He's got the

3    derivative action and he's got the class actions.  And

4    he is going to decide the issues that the plaintiff in

5    this case wants Your Honor to decide.

6                    And on top of that, Judge Castel has

7    made clear that he wants all the derivative claims

8    concerning the funds to proceed through the one action

9    that was filed, the Engel case, and he wants all class

10   actions to proceed in a consolidated fashion, as he's

11   named a lead plaintiff and a lead counsel.

12                   So what the plaintiff is asking for

13   here has significant implications.  It has

14   implications for judicial efficiency, implications for

15   comity, and implications with respect to the issue of

16   inconsistent judgments.

17                   And I do note that the Court in

18   California has already recognized the primacy of the

19   New York forum.

20                   So with that as a background, before

21   the parties -- and, again, we have eight sets of

22   lawyers on this call -- before all of us are put to

23   the burdens of duplicative briefing on issues that are

24   clearly going to be briefed in New York and decided in

1  New York, and before we even implicate the prospect of

2  inconsistent judgments, we ask as a matter of

3  efficiency and comity that the Court address in the

4  first instance only the issue of whether this case

5  should go forward in Delaware, which is a forum issue.

6              And I note in this respect, when the

7  plaintiff was inserting himself in the New York

8  action, when he wrote a letter to Judge Castel on

9  March 4 -- and that was attached as an exhibit to

10  Mr. Shannon's letter of May 6 -- his counsel and

11  himself noted in the letter that "there will likely be

12  motion practice as to venue, consolidation, and

13  appointment of lead plaintiff counsel."

14              So here we are, although a lead

15  derivative plaintiff has, in effect, already been

16  appointed in New York, but given his statement, it

17  couldn't come as a surprise that we're asking to

18  address the venue question first.

19              We are prepared to brief that issue

20  very promptly, and we would hope that briefing on that

21  issue could be completed promptly before Your Honor.

22  And, again, we ask as a matter of judicial efficiency,

23  comity, and avoiding inconsistent judgments, that we

24  go forward with that issue first.

1          Thank you.

2          THE COURT:  Anyone else of the myriad

3  defense counsel want to speak?

4          All right.  Mr. Friedlander?

5          MR. FRIEDLANDER:  Good afternoon, Your

6  Honor.

7          If I could spend about a minute, not

8  more than a minute, on just the background here of the

9  substance.  This is a class and derivative action

10  arising out of the failure of a mutual fund.  And it's

11  the first of its kind since 2008.  And the failure of

12  an open-end mutual fund, it's not supposed to happen.

13  Mutual funds are supposed to be liquid so they can

14  promptly satisfy redemption, and that's why there are

15  illiquidity limits.

16          We conducted a books and records

17  inspection pursuant to the Delaware Statutory Trust

18  Act, and that inspection revealed information to us

19  which allowed us then to do some more digging to

20  discover that the trustees and officers had approved

21  overvaluations of illiquid securities and that they

22  did so in an apparent effort to forestall a run on the

23  fund.

24          And that plan didn't work.  The

1    redemptions continued.  So the fund was left with

2    overvalued illiquid securities that could not be

3    liquidated at prices that would allow for additional

4    redemptions to be redeemed at par.

5                    Now, the first-filed New York

6    plaintiff did not seek books and records.  He did not

7    even sue the outside trustees.  He mistakenly sued all

8    the officers and alleged that the officers and the

9    board were the same people and alleged demand

10   futility.

11                   Then, at some point, he figured out

12   that he had sued the wrong people.  He dropped all the

13   officers except for two and then added in the actual

14   trustees.  So he fixed who the defendants were but he

15   didn't fix his strategy.  He just kept plowing

16   forward.

17                   Even when he sued in state court, he

18   allowed the defendants to remove to federal court even

19   though he had a ready objection that the New

20   York-forum defendants should not -- you know, were not

21   entitled to remove to federal court.  He just allowed

22   them to do it.  And he did that in a document that

23   named himself as an adequate representative and a lead

24   plaintiff in the only action that was then pending.

1          Now, you've heard from the defendants

2    that -- this is in their letter and today.  They talk

3    about alleviating the burden on the courts of having

4    to brief the same 23.1 issue in two courts and

5    avoiding a burden on this Court of deciding an issue

6    that the New York federal court will soon decide.

7          They've said in their letter -- they

8    said today that they're ready to move promptly on the

9    motion to stay or dismiss.  Interestingly, in their

10   letter of May 6th, Your Honor, they wrote that they

11   would be ready to file an opening brief on stay or

12   dismissal no later than May 19, 2016, which is

13   yesterday.  So they're willing to move promptly but

14   not as promptly as they originally promised.

15         In their letters on the merits to the

16   federal judge in New York, they said they wanted to

17   brief the Rule 23.1 motion by itself, reserve all

18   their arguments for their other grounds for dismissal,

19   because of the strength of their demand futility

20   argument, their objections to demand futility.

21         Now, this is not in any of the letters

22   before the Court, but since the correspondence to Your

23   Honor, the plaintiff filed a letter in the Southern

24   District where he decided to rest on his pleading.

12

1              And, basically, he's relying on lots

2    of colorful language more than anything else.  He

3    talks about the red flag of the tightening of the

4    fixed-income markets.  He talks about two-plus years

5    of gormless, catastrophe-courting decision-making and

6    refers to the twin gargoyles of Rales and Caremark.

7              So the plaintiff -- they have the

8    plaintiff they want, and they want to proceed on 23.1

9    against that plaintiff.  But it's not about burden

10   avoidance, because I think it should be plain that the

11   defendants are following the JPMorgan-Walmart

12   playbook.  They want to brief Rule 23.1 in the

13   Southern District of New York and then fight the

14   plaintiff to obtain books and records in Delaware.

15             And then we can brief all sorts of

16   esoteric issues of res judicata and adequacy of

17   representation.  But there's no reason for this Court

18   to stay its hand in adjudicating substantive issues of

19   Delaware law that go to the merits in favor of later

20   litigating New York law, res judicata or issue

21   preclusion or the due process clause.

22             This is the Court that should apply

23   the Delaware Statutory Trust Act.  This is the Court

24   that should apply Delaware demand futility case law.

1  And this is the Court that should interpret the trust

2  instrument of a Delaware statutory trust.

3                   And there's no reason why defendants

4  cannot brief all those issues right away.  They filed

5  their motion to dismiss on May 5th.  They already

6  filed letters in the Southern District of New York

7  outlining their arguments on the merits.  And there is

8  no good reason why briefing on the merits should

9  proceed any slower here than it would proceed in

10 federal court.

11                  There is an upcoming conference in the

12 Southern District on June 1.  We -- the defendants

13 here can get moving right now, and we can join issue

14 promptly.  And I can assure the Court that plaintiffs

15 will do their part to make sure these issues are

16 presented promptly to Your Honor on whatever variety

17 of motions they want to press.

18                  THE COURT:  Here's a question for

19 Mr. Wagner, the lawyer.

20                  Is there a schedule yet for briefing

21 the 23.1 motion in New York?

22                  MR. WAGNER:  No, there is not.

23                  THE COURT:  This is a question back

24 for Mr. Friedlander.

1          So I agree with you that the

2    defendants are following the Walmart-JPMorgan

3    playbook.  It's pretty obvious.  And I don't say that

4    to criticize them.  The defendants want to get out of

5    litigation, and the best way to do it is to fight the

6    weak plaintiff.

7          I was intrigued by the fact that one

8    of the arguments this plaintiff made was the idea that

9    the Delaware Court of Chancery action would be

10   transferred as if it were a federal case and

11   consolidated with New York on that basis.

12         So it's consistent with what you're

13   saying in terms that they have the plaintiff they want

14   and the allegations they want; and, again, that's good

15   for them.

16         This whole system of multi-forum

17   litigation, for reasons that I went into at probably

18   too great a length in Pyott, creates a lot of systemic

19   dysfunction.  It's certainly true that things should

20   be resolved in one forum and at one time, but it

21   doesn't follow from that, at least I don't think, that

22   they should necessarily be followed under a system

23   that incentivizes the filing of a fast complaint by a

24   weak plaintiff so that defendants have the high

1   ground.  The defendants may well deserve the high

2   ground, but they ought to deserve the high ground

3   based on a fair procedural posture, not these sort of

4   hydraulic dynamics that forge the fast filing of a

5   weak complaint.

6                All this is background to say,

7   Mr. Friedlander, let's assume that the defendants are

8   right, because they probably are.  Given the way this

9   fellow has proceeded, he probably does have an

10  extremely weak complaint for purposes of demand

11  futility.

12               If the defendants win in New York, as,

13  presumably, they expect to do, that still comes down

14  and brings a stop to this action and shifts us from

15  the nuances of the Trust Act into the vagaries of

16  collateral estoppel and adequacy of representation and

17  constitutional due process.

18               So what am I saving by letting you go

19  ahead if -- I mean, assume that you're right, and

20  assume that the defendants, having mentioned

21  inconsistent rulings however many times -- I think

22  Mr. Wagner probably mentioned it six or seven times

23  during his presentation.  So Mr. Wagner apparently

24  thinks that your complaint, with the benefit of 220,

1   is likely to win and that the weak plaintiff in New

2   York, who didn't use 220, is likely to lose.  That's

3   probably why the inconsistent rulings are happening,

4   unless he has some different -- I won't comment on the

5   nature of those concerns.

6              So, anyway, let's assume he's right.

7   Won't we be shifting over to collateral estoppel

8   issues anyway?

9              MR. FRIEDLANDER:  Well, first of all,

10  I think it depends on the timing.  First -- maybe this

11  will all be new practice areas for all of us about the

12  more we learn about collateral estoppel and due

13  process and adequacy and what stage and what New York

14  law means on all this, but I would think it would

15  matter which decision came out first.

16             Because if Your Honor rules and says

17  demand futility is established, then I don't think it

18  logically follows that the federal court will just --

19  well, I don't know if we can predict what the federal

20  court will do or what the plaintiff in New York will

21  do.  I mean I guess --

22             THE COURT:  Here's why I'm wondering.

23  My reaction to that is that that's an interlocutory

24  ruling, and so it's not binding to the extent that a

1    final judgment of dismissal is.

2                 A final judgment of dismissal under

3    New York law is binding.  And, hence, essentially

4    what, at least as I understand it, we're facing is a

5    one-way ratchet where if this case hypothetically goes

6    forward, as Mr. Wagner appears to fear, then as soon

7    as he wins in New York, as he appears to expect, we're

8    right back in the same place of briefing the

9    collateral estoppel issues.

10                What we don't have is a situation

11   where, if, as Mr. Wagner seems to expect, I rule in

12   your favor on your good complaint, that that has any

13   effect on the New York action.  It's essentially just,

14   for the New York action's purposes, like an advisory

15   opinion.

16                MR. FRIEDLANDER:  Well, there's a lot

17   of ways this could shake out.  For instance -- well,

18   first of all, we don't know what -- forget ruling on

19   the merits, Your Honor.  Before we get to ruling on

20   the merits, it's unclear what's going to happen in

21   federal court on June 1st in terms of scheduling and

22   going forward on their motions.  And that very well

23   may be informed by how Your Honor rules today just on

24   what kind of schedule we enter into now.

18

1          The federal court has the power under

2     Landis to control its own docket.  It might decide it

3     doesn't make sense for it to be ruling on the Rule

4     23.1 issues on its own.

5          So I guess I would be reluctant to

6     say, you know, how it's going to move and on what time

7     frame.  I know motions to dismiss in federal court

8     here can take some time to get decided.  We don't know

9     if the federal judge in the Southern District is going

10    to hear the 23.1 in isolation, as the defendants are

11    asking, or whether he'll want full briefing on all

12    issues.  So that's why I'm saying there's a lot of

13    different ways this thing could go.

14          But I don't want to avoid Your Honor's

15    question.  I see the point Your Honor is raising

16    about, you know, should it happen and the case gets

17    dismissed in New York, then we may end up having to

18    deal with the issues that Your Honor is referring to,

19    but I don't think that's necessarily the case.

20          MR. WAGNER:  Your Honor, it's

21    Mr. Wagner, not the plaintiff.  May I respond briefly?

22          THE COURT:  Hold on a second.  I was

23    trying to think if I had another question for

24    Mr. Friedlander.  And I do.

1              Mr. Friedlander, so, essentially,

2     again, remembering back to Pyott, what happened there,

3     as I'm sure you know, though you weren't involved, but

4     the California court ruled, and then I had the more

5     thorough complaint in front of me, and we litigated

6     the Delaware motion to dismiss on that basis and dealt

7     with the collateral estoppel issues.  And then, given

8     the ruling in that case, which would have to be

9     different now, given the Supreme Court's ruling,

10    nevertheless, given the difference with that case, we

11    then went to 23.1.

12              Why isn't the solution in this case to

13    sequence it that way; see what happens in New York.

14    If New York goes the plaintiff's way, well, all well

15    and good.  It all gets litigated in New York and, you

16    know, we don't even have to deal with anything.  If it

17    gets dismissed in New York, as the defendants predict,

18    then we would do the Walmart analysis.  And if you

19    overcome the Walmart analysis, we would do the 23.1 if

20    we got there.  You would still have the same set of

21    steps to go through.  They'd just be sequenced

22    differently.

23              Why doesn't that -- I mean, it doesn't

24    protect you in the sense that you're at risk of being

1    precluded by the New York judgment, but if you were in

2    that -- at risk of that anyway, why is there an

3    advantage in us doing things now rather than later?

4                    Is it just to affect, potentially, how

5    things unfold in New York?

6                    MR. FRIEDLANDER:  Well, I think that's

7    important.  I don't want to understate that at all.

8                    As I recall, in Pyott, the way it

9    turned out, the California plaintiff ended up doing a

10   220, and then their case went forward.  The Ninth

11   Circuit allowed it to go forward and followed Your

12   Honor's -- basically verbatim, a lot of Your Honor's

13   ruling on the merits, and allowed the case to go

14   forward.

15                   I don't know what the Zamansky firm --

16   how they will react.  It's funny that -- I mean, it's

17   interesting that they're resting on their complaint,

18   even though we have a lot of public allegations that

19   they could have possibly added to their complaint if

20   they wanted to make their complaint -- bolster it.

21   They've studiously avoided even entering -- talking

22   about valuation at all in their complaint.

23                   So I guess I'm reluctant to say Pyott

24   is a good playbook because things can turn out

21

1    different ways, and it also just strikes me that the

2    orderly way to proceed would be for the Delaware court

3    that has the Delaware issues right before it to rule

4    on that, and that could very well inform how a federal

5    court trying to predict Delaware law would look at

6    those same issues.

7                    THE COURT:  All right.  Well, that's

8    helpful.

9                    Mr. Wagner, now back to you.

10                   MR. WAGNER:  Just on that latter

11   point, that assumes that this Court is going to decide

12   before Judge Castel.  And I don't think anyone can

13   predict what would happen first, but I think the mere

14   fact that we're having this discussion and that you're

15   raising these issues highlights the importance of the

16   forum issue.

17                   I would also note that these issues

18   could have been avoided had the plaintiff in this case

19   followed through in New York and filed a motion to

20   intervene, as he at least alluded to when he wrote to

21   the Court on March 4.  He had --

22                   THE COURT:  The irony of you saying

23   that is I also had the Krasner case.

24                   MR. WAGNER:  That's true.

22

1          THE COURT:  So I happen to know what

2  the response is to that, which is that you all moved

3  to dismiss on the grounds that by intervening, despite

4  you all wanting him to intervene, he has given up any

5  ability to proceed elsewhere.  I guess that

6  technically is on the 220 issue, so it's slightly

7  different.

8          MR. WAGNER:  Right.

9          THE COURT:  But it's not as clear a

10  thing as, you know, everybody gets happy up in New

11  York.

12          MR. WAGNER:  Well, I think they might

13  have predicted what the outcome would be, but they

14  have the documents that made their way -- actually,

15  just a few documents that made their way into their

16  complaint before their motion was -- their motion for

17  intervention and their pleading was due.

18          So it's not as if they didn't have a

19  remedy.  We're in this morass because they decided to

20  avoid Judge Castel even though they wrote to him in

21  the first instance.

22          So it's just -- it's not -- there are

23  eight firms on this call.  How is this in the interest

24  of a fund that's in liquidation?

1              THE COURT:  Actually --

2              MR. FRIEDLANDER:  Your Honor, I'm

3   assuming it's a rhetorical question.

4              THE COURT:  I'm assuming it's a

5   rhetorical question too because there is actually a

6   pretty easy alternative.

7              Do you want to take a crack at

8   answering that for him, Mr. Friedlander?

9              MR. FRIEDLANDER:  Sure.

10             The suit is on behalf of the investors

11  or people who got shortchanged.  We have other folks

12  who were able to redeem at higher levels than they

13  should have and redeemed amounts they shouldn't have.

14  And this is a way to bring order to a disorderly

15  situation created by the defendants in not properly

16  valuing the securities and not obeying the liquidity

17  limits.

18             THE COURT:  All right.  I appreciate

19  hearing from everybody.  Here's what I'm going to do.

20             I absolutely share the sentiments that

21  were expressed earlier that these types of issues

22  should ideally be resolved in one court.  They should

23  be resolved once and for all rather than having

24  multiple cases in different locations.  That's

CHANCERY COURT REPORTERS

1    absolutely right and I agree with it wholeheartedly.

2                      I also don't think that, in terms of

3    any type of ability or competence or anything like

4    that, that this Court, as a hypothetical matter, has

5    any advantage over the U.S. District Court or that the

6    U.S. District Court is in any way less able to handle

7    this.  I don't personally know Judge Castel but I'm

8    sure he's a very qualified person and, certainly, he

9    is in one of the courts that's widely recognized as

10   one of the most sophisticated in the country.

11                     The only advantage that this Court

12   could possibly have is the one that our Chief Justice

13   has mentioned repeatedly, which is the fact that we do

14   a lot of Delaware law, and so by dealing a lot with

15   Delaware law, we develop familiarity with Delaware

16   law.

17                     We do have here the situation where

18   it's not a corporation.  It's a business trust.  And a

19   statutory business trust is not something that has

20   come up frequently in terms of Delaware case law.  So

21   this is an area where one is going to be potentially

22   considering new issues.

23                     Taking all that into account, and

24   because of the manner in which things have

1    proceeded -- not in terms of the judicial proceedings

2    but in terms of the plaintiff's proceedings -- I think

3    that Mr. Friedlander has raised good arguments as to

4    why the books and records that he obtained and the

5    method that he followed could make a substantial

6    difference in potentially how these issues of first

7    impression under Delaware law as to a business trust

8    should be addressed.

9            What that also makes me think is that

10   there isn't value in me considering this case twice:

11   once on the motion to stay and a second time in terms

12   of the motion to dismiss.

13           Balanced against that, notwithstanding

14   Mr. Wagner's arguments, I don't see a lot of

15   incremental burden for the defendants.  The defendants

16   are going to brief these issues regardless.  They're

17   going to write the briefs.  I really don't think

18   they're going to write very different legal analyses

19   for the Southern District than they are going to write

20   for this Court.  So there may be eight firms on the

21   line and however many different lawyers, but it's not

22   going to be a lot of extra work to put the same

23   citations in your New York brief as you do here.  So

24   rather than having two separate briefing sequences,

26

1   we'll have one.

2                    Also, it's clear to me that if the New

3   York Court ultimately does enter a ruling that is

4   final, we're going to have to take that into account

5   here, so we may very well end up shifting to all the

6   types of issues that Mr. Friedlander has adverted.

7   But at least at this preliminary stage, I'm not going

8   to balkanize the motions to dismiss.  You all can

9   brief them once, and we'll all get together once on

10  both dismissal in favor of another forum and in terms

11  of the merits allegations.

12                   Let's do three weeks for the opening

13  brief, three weeks for the answering brief, and three

14  weeks for the reply brief.  Then I'll see you all for

15  a hearing.

16                   Thank you all for getting on the

17  phone.  I appreciate it.  Have a good day.

18                   MR. SHANNON:  Thank you, Your Honor.

19                   MR. FRIEDLANDER:  Thank you, Your

20  Honor.

21                   MS. SCHMIDT:  Thank you, Your Honor.

22                   (Conference adjourned at 2:30 p.m.)

23                          -  -  -

24

1                      CERTIFICATE

2

3               I, JEANNE CAHILL, RDR, CRR,

4   Official Court Reporter for the Court of Chancery of

5   the State of Delaware, do hereby certify that the

6   foregoing pages numbered 3 through 26 contain a true

7   and correct transcription of the proceedings as

8   stenographically reported by me at the hearing in the

9   above cause before the Vice Chancellor of the State of

10  Delaware, on the date therein indicated.

11              IN WITNESS WHEREOF I have hereunto set

12  my hand at Wilmington, Delaware, this 23rd day of May,

13  2016.

14

15

16                     /s/ Jeanne Cahill
                 ----------------------------
17                 Jeanne Cahill, RDR, CRR
                 Official Chancery Court Reporter
18                Registered Diplomate Reporter
                  Certified Realtime Reporter
19

20

21

22

23

24